469 A.2d 476

**Douglas Lornell SANDERS**

v.

**STATE of Maryland.**

**No. 337, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Jan. 10, 1984.

Certiorari Denied May 28, 1984.

158

Gerald A. Kroop, Baltimore, with whom were Ronald I. Kurland and Kroop & Kurland, P.A., Baltimore, on brief, for appellant.

Deborah K. Chasanow, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty. for Montgomery County and Michael D. Mason, Asst. State's Atty. for Montgomery County on the brief, for appellee.

Argued before WEANT, ALPERT and BELL, JJ.

ALPERT, Judge.
*"The best laid schemes o'mice and men,
So oft go awry."* [1]

In this case a carefully calculated murder plot would *not* have gone awry were it not for the chance arrest of Robert Smithson for shoplifting on March 18, 1982. Apparently trying to avoid culpability for that charge, Smithson voluntarily informed the Montgomery County police that Douglas Lornell Sanders, appellant, had offered him a contract to murder an Internal Revenue Service (IRS) agent. Raymond R. Petronchak, an IRS criminal inspector, was summoned to investigate.

Smithson related that on March 6, 1982, appellant had approached him and agreed to pay five thousand dollars if Smithson killed a certain IRS agent. Appellant further agreed to provide a weapon to accomplish this murder. The target of this agreement was ultimately determined to be W. Stewart Connard, whom appellant considered to be an overly aggressive auditor. Connard was engaged in an expansive audit of Joel Davis, a certified public accountant, who had prepared tax returns for appellant and appellant's

---

1. Translated from *To A Mouse* by Robert Burns (1785).

businesses. Davis and appellant were co-owners of Dial-A-Tow, Inc. and appellant was a partial owner in a firm called R & S Construction. Appellant erroneously believed that Connard's audit of Davis included him and his businesses and that Connard sought criminal convictions. Appellant told Smithson that if Connard were no longer working on the case, another IRS agent would settle the investigation in exchange for a payment of back taxes. The murder was to take place at Connard's residence and was to look like a robbery. Petronchak inquired whether Smithson would introduce him to appellant. Smithson responded negatively. The criminal inspector then queried whether Smithson would allow himself to be "wired" and meet appellant. Smithson agreed to this plan. At the conclusion of this debriefing, Petronchak instructed Smithson to report to his IRS office in Washington, D.C. the following morning.

Smithson dutifully arrived around 7:30 a.m. on the morning of March 19, 1982. Petronchak contacted Connard, verified his auditing of Davis, informed him he was the target of a murder conspiracy and suggested that Connard leave town. Petronchak's branch chief received approval in accordance with federal administrative procedures for consensual monitoring of a telephone conversation between Smithson, in the IRS's Washington office, and appellant in Seat Pleasant, Maryland. During the course of this conversation Smithson arranged to meet appellant later that day in Silver Spring, Maryland.

Smithson was "wired" with a recorder and escorted to the agreed meeting place. During the course of this meeting appellant furnished Smithson with a gun and six bullets and a piece of paper with Connard's address and car license tag number. The two men discussed Connard's commuting habits. Appellant assured Smithson that if the scheme succeeded, there would be no way for the hired killer to be detected since Smithson was unknown to Davis and appellant planned to have an alibi.

This entire conversation was recorded by IRS agents in a nearby vehicle. Appellant was arrested by the agents after Smithson departed the area.

Appellant filed several pre-trial motions; only two of these motions, however, are relevant to this appeal. Appellant moved to suppress the electronic surveillance evidence and evidence from his federal income tax returns. Both motions were denied and the evidence was introduced at appellant's trial.

A jury in the Circuit Court for Montgomery County convicted appellant of solicitation to commit murder and attempt to commit murder. On February 25, 1983, appellant was sentenced to a 25 year term of imprisonment for the solicitation conviction. The trial judge did not impose a sentence on the attempt to murder conviction.

Before this Court, appellant alleges that the trial judge erred by denying both motions to suppress. Further, appellant argues that the lower court abused its discretion by denying his motion for mistrial. Additionally, the State has filed a cross-appeal asking us to consider whether the trial court mistakenly declined to impose a mandatory 25 year sentence for appellant's attempted murder conviction.

We shall first address the issues raised by appellant.

I. *Use of Electronic Surveillance Evidence*

Appellant's first contention concerns the electronic surveillance of his March 19, 1982 conversations with Smithson. He claims that any evidence derived from these interceptions should have been inadmissible in any trial or proceeding in Maryland because federal IRS agents are not "investigative or law enforcement officers" within the ambit of Maryland wiretap and electronic surveillance law.

■■ Appellant's argument requires us to focus on the interrelationships of federal and state eavesdropping laws. In 1968, Congress enacted the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, tit. III, §§ 801–804, 82 Stat. 197, to establish minimum guidelines for wire intercep-

tions and interceptions of oral communications. *State v. Bailey,* 289 Md. 143, 151, 422 A.2d 1021 (1980). The federal wiretap provisions, codified in 18 U.S.C. §§ 2510–2520, permit the states to create standards for interceptions by *state* officials. 18 U.S.C. § 2516(2). These state standards may be more protective of citizens' privacy than the federal minimum requirements. *State v. Mayes,* 284 Md. 625, 627–28, 399 A.2d 597 (1979). Where a state legislature has adopted stricter privacy protections than those guaranteed by federal law, the stricter state standards shall apply to determine admissibility. *United States v. Curreri,* 388 F.Supp. 607, 613 (D.Md.1974).

Maryland's present Wiretapping and Electronic Surveillance Act was enacted in 1977 and is codified in Md.Code Cts. & Jud.Proc.Ann. §§ 10–401 *et seq.* It is modeled after its federal counterpart and extensively tracks its provisions. *Wood v. State,* 290 Md. 579, 583, 431 A.2d 93 (1981). The General Assembly has made certain provisions of Maryland's law more restrictive than federal law. *Id.*[2]

The relevant Maryland statute in the case *sub judice* is § 10–402(c)(2) which governs the interception of oral communications where one party consents to the interception.

It is lawful under this subtitle for an investigative or law enforcement officer acting in a criminal investigation or any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer to intercept a wire or oral communication in order to provide evidence of the commission of the offenses of murder, kidnapping, gambling, robbery, and felony punishable under the 'Arson and Burning' subheading of Article 27, bribery, extortion, or dealing in controlled dangerous substances, or any conspiracy to commit any of these offenses, where the person is a party to the commu-

---

2. For a comparison of each provision of the Maryland Act to its federal analogue, see, R. Gilbert, *A Diagnosis, Dissection and Prognosis of Maryland's New Wiretapping and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183 (1979).

nication or one of the parties to the communication has given prior consent to the interception.

The Act requires that interceptions be conducted by or under the supervision of an investigative or law enforcement officer, a term defined in § 10–401(6) as:

[A]ny officer of this State or a political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this subtitle, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses; ...

Interceptions by federal officers where one party consents to the interception are regulated by 18 U.S.C. § 2511(2)(c) which provides:

It shall not be unlawful under this chapter for a *person* acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(Emphasis supplied.) "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation; ..." 18 U.S.C. § 2510(6).

A comparison of the aforequoted Maryland and federal statutes reveals a certain similarity. Both allow legally authorized personnel to intercept wire or oral communications where one party to the communications consents. On the other hand, Maryland law limits authorized personnel through definition of the term "investigative or law enforcement officer" in that it apparently permits only Maryland personnel to make this sort of interception. Moreover, Maryland limits the authority to intercept to investigations of certain offenses, one of which is an offense evidenced in this case—conspiracy to commit murder.[3]

---

**3.** Agent Petronchak testified that, at the outset, the IRS investigation was for conspiracy to murder auditor Connard.

 Appellant does not contest that Smithson consented to having the conversations monitored. Further, at trial, Agent Petronchak elaborated on how IRS Manual procedures were precisely followed to obtain approval for the consensual monitoring. Approval for the telephone monitoring was received from the Assistant Regional Inspector in Philadelphia. Approval for the body wire was authorized by the national IRS office upon Agent Petronchak's written application to the Attorney General of the United States.[4] Therefore, the IRS agents acted in full compliance with federal law. 18 U.S.C. § 2511(2)(c), *supra*. *See also* 26 U.S.C. § 7608 which sets out the powers and authorities of internal revenue enforcement officers. We observe that the IRS agents' actions conformed to Maryland's stricter interception laws because the conversation was monitored during an investigation of one of the crimes specified in Md.Code Cts. & Jud.Proc.Ann. § 10–402(c)(2), *supra*. We further observe that this interception could not arguably be illegal under Maryland law had Maryland authorities participated in the eavesdropping.

Mindful that "no part of the contents of the communication and no evidence derived therefrom may be received in evidence . . . if the disclosure of that information would be in violation of . . ." the Maryland "Wiretapping and Electronic Surveillance" laws, Md.Code Cts. & Jud.Proc.Ann. § 10–405, we are left to decide whether Maryland's narrower definition of investigative or law enforcement officer should result in suppression of the lawfully obtained interception by federal officials. Stated more succinctly: Did federal agents violate Maryland law by "disclosing" the contents of the conversations?

 We are acutely aware that the wiretap law procedures must be strictly followed. *State v. Siegel,* 266 Md.

---

4. The applicable provision (as it existed in 1975), § 652.22 of the IRS Manual, is discussed and set out in *United States v. Caceres,* 440 U.S. 741, 744–46 & n. 4, 99 S.Ct. 1465, 1467–68 & n. 4, 59 L.Ed.2d 733 (1979).

256, 274, 292 A.2d 86 (1972). We are equally cognizant that the purpose behind wiretap exclusionary rules is to deter law enforcement officers from violating personal privacy rights by ensuring that the courts do not become partners in illegal police conduct. *See, People v. Fidler,* 72 Ill.App.3d 924, 29 Ill.Dec. 51, 52, 391 N.E.2d 210, 211 (1979).

With this objective in mind, we shall reach the determination that suppression of the conversations recorded by federal IRS agents was not required in this case. It is pellucid that appellant was accorded every privacy protection guaranteed to Maryland citizens by Maryland's stricter wiretap and electronic surveillance law. Accordingly, we need not fear placing our imprimatur on the lawful conduct of the federal IRS agents. We are loathe to reverse appellant's conviction solely because the officials who *lawfully* intercepted his communications with Smithson were not Maryland investigative or law enforcement officers. To accept the legal argument espoused by appellant, we would be holding that Maryland's wiretap and electronic surveillance law pre-empts federal law and that no evidence lawfully obtained by federal law enforcement officers could ever be admissible in a Maryland judicial proceeding. We are, of course, precluded from reaching such a result.

Whenever conflicts arise between enactments of Congress and the States, the Supremacy Clause to the United States Constitution, art. VI, cl. 2, mandates that enactments by the national government shall govern. *See also* Md.Declaration of Rights, art. 2. Where state law is in conflict with federal law, the state law is "void to the extent it conflicts with a federal statute." *Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981) (and cases cited therein). Consequently, any state law which "stands as an obstacle to the accomplishment and objectives of Congress" is unenforceable. *Id. (quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

We have previously recognized that federal law, specifically 18 U.S.C. § 2516(2) authorizes the States to promulgate laws permitting interceptions by state officials. While the standards for *state* law enforcement officers may be more restrictive of personal privacy rights than the federal provisions, such state standards may not supersede federal law. *United States v. Hall,* 543 F.2d 1229, 1232 (9th Cir.1976) (en banc), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977). Section 2516(2) does not empower the states to create stricter standards for *federal* law enforcement officials operating in their state. *Id.*

The Maryland General Assembly was presumably well aware of this limitation when it enacted Maryland's first law regarding the interception of oral communications, Md. Ann.Code, art. 35, §§ 92–99 (1957), repealed and recodified in Md.Code Cts. & Jud.Proc.Ann. §§ 10–401 *et seq.* (1973) (interceptions of oral communications) and Md.Ann.Code, art. 27, §§ 125A–125C (1957) (interception through use of electronic devices). The legislature specifically provided in then § 10–407(a) (1973) that "[t]his subtitle does not apply to the Federal Bureau of Investigation or to any other federal investigating agency." We note that no similar provision is found in the sections pertaining to electronic devices.

In 1977, Md.Code Cts. & Jud.Proc.Ann. §§ 10–401 *et seq.* and Md.Ann.Code, art. 27, § 125A–125C were repealed and replaced by Maryland's present Wiretapping and Electronic Surveillance Act, Md.Code Cts. & Jud.Proc.Ann. §§ 10–401 *et seq.* (1977, 1980 Repl.Vol., 1982 Cum.Supp.). The aforequoted § 10–407(a) (non-applicability to federal agents) was not included in the newly enacted law. Such inclusion was unnecessary, however, as the Legislature, presumptively aware of the supremacy of federal law regulat-

ing the activities of federal officials,[5] would not attempt to promulgate a restriction which would be unenforceable. Additionally, it is inconceivable that the Legislature intended to subject federal law enforcement officers to Maryland civil and criminal sanctions for violations of state law, Md.Code Cts. & Jud.Proc.Ann. §§ 10–402(b) and 10–410, simply because the lawful interception was achieved without the participation of a Maryland investigative or law enforcement officer.

■ Appellant's assertions would require us to violate a cardinal principle of statutory construction that statutes are not to be construed in a manner which would lead to an absurd result. *See, Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464 (1978) (and cases cited therein). The General Assembly was not blind to the reality that federal law enforcement officials are authorized to act within each of the fifty states. Nor were Maryland's legislators unaware that inevitably, there would be occasions where investigations which were originally entirely federal in nature would result in prosecutions by State authorities.

■ Appellant points out that the Legislature has changed the law as of July 1, 1983 to allow evidence lawfully obtained by federal agents to be admissible in Maryland courts. Md.Code Cts. & Jud.Proc.Ann. § 10–407(f) (1980 Repl.Vol., 1983 Cum.Supp.) provides:

Any law enforcement officer of the United States, who has lawfully received any information concerning a wire or oral communication or evidence lawfully derived therefrom, which would have been lawful for a law enforcement officer of this State pursuant to § 10–402(c)(2) of this subtitle to receive, may disclose the contents of that communication or the derivative evidence while giving

---

**5.** The Legislature is presumed to have had knowledge of prior and existing federal wiretap and electronic surveillance legislation. *See, Mayfield v. State,* 56 Md.App. 541, 552-553, 468 A.2d 400 (1983).

testimony under oath or affirmation in any proceeding held under the authority of this State.

At argument, counsel for both appellant and the State seemed to believe that this new provision was spawned by the situation presented at appellant's trial. After an exhaustive search for legislative history, however, we were unable to locate documentary evidence as to why § 10–407(f) became law. Rather than view this new provision to be a change in Maryland law, we conclude that § 10–407(f) was enacted out of an abundance of caution to clarify situations similar to the one presented in the case at bar. This was done notwithstanding the existence of Section 10–407(c) (1977, 1980 Repl.Vol., 1982 Cum.Supp.) which demonstrates the Legislature's broad intent to permit the disclosure of legally obtained interceptions in Maryland judicial proceedings.

Any *person* who has received, *by any means authorized by this subtitle,* any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this subtitle, may disclose the contents of that communication or the derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of this State or any political subdivision thereof.

(emphasis supplied.) "Person" is broadly defined in § 10–401(5) to be "any employee or agent of this State or a political subdivision thereof, and *any individual,* partnership, association, joint stock company, trust, or corporation" (emphasis supplied). *Compare with* 18 U.S.C. § 2510(6), *supra.* As it is crystalline that IRS agents are "individuals" who received interceptions of oral communications "by a means authorized" by Maryland's wiretap and electronic surveillance law, the evidence was admissible at appellant's trial.

The function and purpose of Maryland's eavesdropping law has been satisfied as the interception of the communications was performed in a lawful manner by persons who were legally authorized. A similar result was reached in

*People v. Fidler, supra,* where federal postal authorities wiretapped an informant's phone, with the informant's consent, after receiving proper authority from the Chief Postal Inspector. At trial, Fidler's motion to suppress was granted because the federal law enforcement officer had not complied with the Illinois Eavesdropping Statute. On appeal, the Illinois intermediate appellate court reversed.

The purpose of the exclusionary rule is to deter law enforcement officers from violating the constitutional rights of citizens by removing the incentive for disregarding such rights. (*See, e.g., Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.) The suppression order in this case did not serve this end, however, since the actions of the federal postal authorities, pursuing a wholly federal investigation, were entirely lawful, and the record contains no hint of collusion between federal and state authorities seeking to avoid the limitations of the Illinois Eavesdropping Statute. The only result of the entry of the suppression order in this case is that it prevents highly probative evidence from being available to the finder of fact in a criminal trial. In our view, the order constituted an unwarranted extension of the exclusionary rule and must therefore be reversed. *See, Commonwealth v. Bennett* (1976), 245 Pa.Super. 457, 369 A.2d 493; *but see also, People v. Jones* (1973), 30 Cal.App.3d 852, 106 Cal.Rptr. 749, appeal dismissed 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40.

29 Ill.Dec. at 52, 391 N.E.2d at 211.

Unlike the federal authorities in *Fidler,* the IRS agents in this case acted in full compliance with the standards required by Maryland law. We believe that the logic expressed in *Fidler* is especially applicable here. Therefore, we hold that so long as federal officials conducting a federal investigation comply with the applicable standards (state and federal) when intercepting oral or wire communications, suppression of the fruits of their investigation is unwarranted.

II. *Admissibility of Federal Income Tax Return Information*

Next, appellant complains that the disclosure of federal tax return information concerning Joel Davis, R & S Construction, Dial-A-Tow, Inc. and himself violated confidentiality protections accorded by federal law. At oral argument appellant conceded he has no standing to assert that the confidentiality of another person, Joel Davis, had been breached. Accordingly, our analysis need only concern appellant and his businesses.

Once again, we turn to federal statutes and case law to resolve appellant's argument. Title 26, U.S.C. § 6103(h)(4)(A) governs the disclosure of federal taxpayers' returns and return information in State judicial proceedings, and provides in pertinent part:

A return or return information may be disclosed in a Federal or State judicial or administrative proceeding *pertaining to tax administration,* but only [if]

(A) the taxpayer is a party to the proceeding, ...

(emphasis supplied.) In this instance appellant was obviously a party to the proceeding. Therefore, we must determine whether his trial for soliciting the murder of an IRS agent pertains to tax administration. Tax administration is "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws." 26 U.S.C. § 6103(b)(4)(A)(i).

The United States Court of Appeals for the Second Circuit has declared that this term shall be broadly defined. *United States v. Mangan,* 575 F.2d 32 (2d Cir.1978). In that case, Mangan, an IRS agent, was prosecuted for conspiring to file false claims against the United States, mail fraud, and filing false and fraudulent income tax returns. The Government's case largely rested on Mangan's tax returns as these documents were used as exemplars to support expert opinion connecting Mangan to the fictitious returns and also evidenced the scheme used by Mangan to produce refund claims in the falsified returns. Judge Friendly rejected the conten-

tion that the phrase in question related solely to disputes between the Government and a taxpayer whose returns are relevant to his own tax liability and not to a situation where the Government uses the returns of an IRS employee to prove fraud.

> This language does not evidence an intention to adopt a restrictive interpretation of 'tax administration.' Furthermore, the definition of 'tax administration' in § 6103(b)(4) is so sweeping as to compel rejection of a restrictive interpretation. Clearly this case involved 'the administration, management, [and] conduct . . . of the execution and application of the internal revenue laws' and 'assessment, collection, enforcement [and] litigation . . . functions under such laws.'

*Id.* at 40 (footnote omitted).

More recently, the disclosure of tax returns was held proper where the appellant pled guilty to conspiracy to defraud the United States by impeding the lawful function of the IRS since "an offense of attempting to interfere with the administration of the IRS laws . . . pertain[ed] to tax administration as contemplated by 26 U.S.C. § 6103(b)(4)." *Davidson v. Brady,* 559 F.Supp. 456, 461 (W.D.Mich.1983).

■ We believe that the planned murder of an IRS agent for the express purpose of terminating that agent's zealous audit is an obvious attempt to obstruct the lawful conduct of the IRS. Hence, the prosecution for such action pertains to tax administration and appellant's returns and return information were lawfully disclosed.

### III. *Motion for Mistrial*

Transcripts of the March 19, 1982 afternoon conversation recorded between appellant and Smithson were prepared by the State to assist the jury. The trial court decided that the jury would not be permitted to use the transcripts while listening to the tapes or during its deliberations. The court did allow the prosecutor to use an enlarged copy of the transcript during his closing argument. Appellant moved

for a mistrial when the Assistant State's Attorney furnished news and media reporters with copies of the transcripts. Appellant's motion was denied.

On appeal, appellant concedes that "the record does not reflect that the disclosure to the reporters of the transcript, and its subsequent appearance in news reports, was prejudicial." He does, however, assert that the court erred by denying his motion *before* questioning each juror individually to determine that they were not influenced by the news accounts.

The trial judge shall declare a mistrial only under extra-ordinary circumstances and where there is a manifest necessity. *Cornish v. State,* 272 Md. 312, 317, 322 A.2d 880 (1974). We note that the trial judge questioned the jury as a group as to whether they had read or heard news reports concerning the trial. The court, on the record, took notice that all the jurors shook their heads indicating a negative response. We find that this procedure coupled with the trial judge's repeated admonitions for the jury not to be exposed to media accounts obviated the necessity for individual inquiry. Accordingly, we find that the trial court properly denied appellant's motion for mistrial.

Having concluded that appellant's arguments do not merit reversal, we now turn to the issue raised by the State.

## CROSS APPEAL

The trial judge refused the State's request to impose a mandatory 25 year sentence under Md.Ann.Code, art. 27, § 643B(c) for appellant's attempted murder conviction. Indeed, the court imposed no sentence on that conviction. The lower court believed that the statutory requirements had not been met because one of appellant's prior convictions was as an accessory before the fact of robbery, rather than as a principal. The State posits that this decision was in error requiring us to vacate appellant's (non-) sentence for at-

tempted murder and remand for imposition of the mandatory sentence. We agree.

Maryland Ann.Code, art. 27, § 643B(c) provides:

Any person who (1) has been convicted on two separate occasions of *a crime of violence* where the convictions do not arise from a single incident, and (2) has served at least one term of confinement in a correctional institution as a result of a conviction of *a crime of violence,* shall be sentenced, on being convicted a third time of a crime of violence, to imprisonment for the term allowed by law, but, in any event, not less than 25 years. Neither the sentence nor any part of it may be suspended, and the person shall not be eligible for parole except in accordance with the provisions of Article 31B, § 11. A separate occasion shall be considered one in which the second or succeeding offense is committed after there has been a charging document filed for the preceding occasion.

(emphasis supplied). At the time of appellant's sentencing, crimes of violence were delineated in § 643B(a) (1957, 1982 Repl.Vol.):

As used in this section, the term 'crime of violence' means abduction; arson; burglary; daytime housebreaking under § 30(b) of this article; kidnapping; manslaughter, except involuntary manslaughter; mayhem; murder; rape; robbery; robbery with a deadly weapon; sexual offense in the first degree; sexual offense in the second degree; use of a handgun in the commission of a felony or other crime of violence; an attempt to commit any of the aforesaid offenses; assault with intent to murder; and assault with intent to rape.[6]

Appellant/Cross-Appellee points out that "conspicuously omitted from this definition is the inclusion of those persons who have been convicted as an accessory to a crime." What we must decide, therefore, is whether appellant/cross-appel-

---

[6]. Appellant was sentenced on February 25, 1983. Effective July 1, 1983, the phrase "and maiming under §§ 384, 385 and 386 of this article" was added after the word "mayhem."

lee's prior conviction for accessory before the fact of robbery falls into the definition of "crime of violence."

Maryland stands as the only American jurisdiction which retains the common law doctrine of accessoryship. *State v. Ward,* 284 Md. 189, 191 & n. 3, 396 A.2d 1041 (1978).[7] This doctrine holds all parties to a crime guilty of a felony regardless of whether the party acted as a principal or accessory. This concept was cogently explicated by Judge Orth in *Ward:*

> Accessoryship before the fact was not a substantive offense under common law, and there being neither statute nor judicial decision in this jurisdiction making it so, it is not a substantive offense in Maryland. *The common law theory of parties was based upon the concept of one crime with guilt attaching to several persons.* The application of this theory to murder was well expressed in *State v. Ayers,* 67 Tenn. 96 (1874):

> > 'The offense is compounded of the connivance of the accessory and the actual killing by the principal felon, and the crime of the accessory, thought inchoate in the act of counseling, hiring or commanding, is not consummate until the deed is actually done. *The law in such case, holds the accessory before the fact to be guilty of the murder itself, not as principal, it is true, but as accessory before the fact, for it is the doing of the deed, and not the counseling, hiring or commanding that makes his crime complete; and it is for the murder that he is indicted, and not for the counseling and procuring.'* *Id.* at 100.

---

**7.** *But see Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979), where the Court of Appeals judicially abrogated the common law requirement that principals be tried prior to accessories. *Id.* at 716, 404 A.2d 1073. The *Lewis* court's holding did not disturb other aspects of the doctrine of accessoryship.

Interestingly, in *Lewis,* the State asserted that the common law distinctions between principals and accessories should be abolished. In the case *sub judice,* the State's cross-appeal relies on the continued existence of the common law doctrine.

Thus it is that Hale spoke of 'an accessory to murder before the fact,' 1 Hale P.C. *435, rather than 'an accessory before the fact to the crime of murder,' *or some similar form,* as is used under modern statutes which make accessoryship before the fact a separate substantive offense. Perkins [, *Criminal Law*] at 649 [ (2d ed. 1969) ].

284 Md. at 204, 396 A.2d 1041 (emphasis supplied). Thus, since Maryland recognizes that accessories are equally culpable for a principal's act, we must conclude that appellant/cross-appellee's prior conviction as an accessory before the fact of robbery is tantamount to a conviction for robbery—a crime of violence according to § 643B(a) and a crime to be considered by a trial judge when evaluating the propriety of imposing a sentence under § 643B(c).

Returning to appellant/cross-appellee's argument that accessory before the fact of robbery does not appear in § 643B(a), *supra,* we once again respond that the Legislature is presumed to act with full knowledge as to prior and existing law and legislation on the subject of the statute and as to judicial decisions with respect to such prior law and legislation. *See Mayfield v. State, supra* at note 5. As Maryland law has manifestly retained the common law notion of guilt attaching to all parties to a crime, the General Assembly had no need to include a prior conviction of accessory to a crime within the definition of crime of violence. Accordingly, appellant/cross-appellee's argument fails.

▮ The sentence outlined in Md.Ann.Code, art. 27, § 643B(c) is mandatory and "if the statutory requirements are met, the sentence *must* be imposed." *Loveday v. State,* 296 Md. 226, 237, 462 A.2d 58 (1983) (emphasis in original). As each of the statutory requirements have been met and because the State complied with all relevant procedures under the Maryland Rules,[8] appellant *must* receive the man-

---

8. The record reflects that the State, in accordance with Md.Rule 734 c, provided appellant/cross-appellee with the requisite notice of its

datory 25 year sentence for his conviction for attempted murder.

JUDGMENTS AFFIRMED; SENTENCE IMPOSED IN CRIMINAL # 29223 VACATED; REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR IMPOSITION OF SENTENCE IN ACCORDANCE WITH MD.ANN.CODE, ART. 27, § 643B(c); APPELLANT TO PAY THE COSTS.

intention to seek a mandatory sentence. *See also King v. State,* 55 Md.App. 672, 466 A.2d 1292 (1983).