748 A.2d 34

**William M. CHAIRES**

**v.**

**CHEVY CHASE BANK, F.S.B., et al.**

**No. 739, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 10, 2000.

See also: 127 Md.App. 231, 732 A.2d 388.

Edward J. Lilly (John B. Bratt and the Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellants.

David J. Cynamon (Darryl G. McCallum and Shaw Pittman, Washington, DC, F. Robert Troll, Jr. and O'Malley, Miles, Nylen & Gilmore, P.A., on the brief), Calverton, for appellees.

Argued before DAVIS, THIEME and KENNEY, JJ.

KENNEY, Judge.

In June 1988, William and Laurie Chaires executed a promissory note and Deed of Trust securing a $350,000 loan from B.F. Saul Mortgage Company ("Saul"), a wholly owned subsidiary of Chevy Chase Bank, F.S.B. ("Chevy Chase"), appellees. This note was later assigned to Chevy Chase. In May 1995, the Chaireses brought suit against Chevy Chase and Saul, alleging illegal conduct by charging loan fees in excess of those permitted under Maryland's Secondary Mortgage Loan–Credit Provisions Law ("SMLL"), codified in Md.Code Ann. (1975, 1990 Repl.Vol.), § 12–401 et seq. of the Commercial Law Article ("C.L.").

The circuit court entered final judgment in favor of the Chaireses. Prior to consideration of the matter by this Court, the Court of Appeals issued a writ of certiorari on their own motion. The Court of Appeals held that a statutory lien on the Chaireses' waterfront property was a lien of prior encumbrance and that the Chaireses' loan was a second lien subject to SMLL. Because Mr. Chaires failed to disclose this prior lien on the property while acting as attorney for all parties to the loan, however, the Chaireses were estopped from asserting SMLL claims. *See, Chevy Chase Bank, F.S.B. v. Chaires,* 350 Md. 716, 715 A.2d 199 (1998) (*"Chaires I"*).

On September 22, 1997, the Chaireses initiated this suit against Chevy Chase alleging that it continued to impose illegal loan fees after the decision in *Chaires I* and that such actions constituted unfair and deceptive trade practices and harassment. The Chaireses claimed that, in light of the holding of *Chaires I,* appellees had actual knowledge, independent of any involvement by Mr. Chaires, that the loan was subject to the SMLL and yet continued to impose illegal

charges. The Chaireses amended their complaint on November 19, 1997 and August 3, 1998 to add Jerry and Patricia Nelson[1] and Hillman Foster[2] as additional plaintiffs in the suit, and also added Saul and the First National Bank of Chicago as defendants.

Chevy Chase and Saul filed a motion for summary judgment, arguing that federal law preempted any state law violations, that the Chaireses were estopped from arguing state law violations under *Chaires I,* and that the Nelsons were barred based on *res judicata.* The trial court, in a written opinion dated October 9, 1998, granted their motion for summary judgment. While recognizing the Court of Appeals' ruling in *Chaires I,* the trial court found that the federal preemption issue was not addressed. The trial court held that Chevy Chase was a federal savings and loan institution subject to the federal regulations. The trial court further found that the federal regulations, specifically the Office of Thrift Supervision ("OTS") regulations, conflicted with SMLL and Maryland's Credit Grantor Closed End Credit Provisions[3] ("CECP"), and held that "OTS federal regulation preempts the charges to the extent they are not allowed by the CECP or SMLL." The trial court also found that the Foster and Nelson loans were first mortgages and therefore subject to the federal Depository Institution Deregulation and Monetary Control Act ("DIDMCA"), as codified in 12 U.S.C. § 1735f-7, which also preempted state usury laws concerning "federally related" first mortgages on residential property.

---

**1.** The Nelsons executed a promissory note and Deed of Trust securing a $226,000 loan from B.F. Saul on February 26, 1991, which was later assigned, in February 1996, to Chevy Chase. In turn, Chevy Chase sold the note to First National Bank of Chicago, but Chevy Chase still serviced the loan as First National's agent.

**2.** On December 19, 1996, Hillman Foster executed a promissory note and Deed of Trust securing a $180,500 loan from B.F. Saul. The note was assigned later to Chevy Chase for servicing.

**3.** C.L. § 12–1001 et seq.

Additionally, the trial court found that the Chaireses were barred from recovery based on estoppel grounds as discussed in *Chaires I,* and that the Nelsons were similarly barred by *res judicata* based on prior foreclosure proceedings. A foreclosure action had been previously instituted against the Nelson property, whereby the Nelsons, through their attorney, Mr. Chaires, filed exceptions, alleging that Chevy Chase violated "Maryland's Commercial Law Article generally, Title 10 specifically." Chevy Chase responded to the exceptions, raising the issue of federal preemption. Without discussion, the Circuit Court for Anne Arundel County overruled the Nelsons' exceptions and ratified the sale ("Final Order Ratifying Sale"). The trial court in this action found that the Final Order Ratifying Sale was an unappealed adjudication that barred further litigation on the preemption issue.

Although the trial court's entry of summary judgment was originally entered in favor only of Chevy Chase, the trial court subsequently entered a Final Order in which it granted summary judgment in favor of Chevy Chase and B.F. Saul for all claims.[4] The Chaires, the Nelsons, and Foster, appellants, filed a timely notice of appeal presenting the following questions, which we have re-ordered and slightly rephrased:

I. Did the trial court err in ruling the Chaireses were estopped from pursuing claims for violations of the SMLL after the Court of Appeals decision in *Chaires I?*

II. Did the trial court err in granting summary judgment in favor of Chevy Chase and B.F. Saul as to the Nelsons based on *res judicata?*

III. Did the trial court err in granting summary judgment in favor of Chevy Chase and B.F. Saul on the issue of federal preemption?

IV. Did the trial court err in granting summary judgment in favor of Chevy Chase and B.F. Saul on the issue of

---

4. On December 7, 1998, the trial court granted First National Bank of Chicago's unopposed motion to dismiss.

federal preemption because it failed to consider the circumstances surrounding the individual loans and whether they were preempted by the federal regulations?

V. Did the trial court abuse its discretion in refusing to allow appellants the opportunity to conduct discovery prior to the resolution of the summary judgment motion?

## DISCUSSION

### I.

■ Appellants argue that the trial court erred in ruling that the Chaireses were estopped from asserting that appellees violated the SMLL. They contend that, by virtue of the holding in *Chaires I*, appellees were aware that they were subject to SMLL and thereby had actual knowledge that their activity was illegal.[5]

---

**5.** In 1980, Mr. Chaires purchased waterfront property located at 5 Loudon Lane in Annapolis, Maryland. Because his property was being eroded by the Severn River, he entered into a loan agreement with the Department of Natural Resources ("DNR"), in which the DNR loaned Chaires $20,690 pursuant to the Shore Erosion Control Law for the purpose of building a bulkhead to control the erosion problem. It was a recorded, no interest loan payable over 25 years and secured by a statutory lien on the Loudon Lane property. In 1988, Mr. & Mrs. Chaires secured a $350,000 loan, also secured by the Loudon Lane property, from Queenstown Bank to finance the construction of a residence on the property. This loan neither indicated that it was a first lien, nor that the property was subject to the shore lien.

The Chaireses in turn, refinanced the Queenstown loan with Saul, as a first mortgage loan in the amount of $350,000. Mr. Chaires, a Maryland attorney, acted as settlement attorney for all parties involved. He did not disclose to Saul that the property was subject to the shore lien. The mortgage was subsequently assigned to Chevy Chase for servicing. Mr. Chaires later filed suit against Chevy Chase, alleging violation of SMLL for the imposition of illegal fees.

The Court of Appeals ultimately held that the shore lien was a first lien on the property such that Chevy Chase was subject to the SMLL. However, the court found that Mr. Chaires's actions as attorney for both parties and his failure to disclose the existence of the shore lien to Saul estopped him from asserting violations of the SMLL.

In support of their claim, the Chaireses assert that the trial court's ruling "is contrary to both the law governing the doctrine of estoppel and the facts of this case." They argue that the trial court's holding "fails to recognize that the present litigation is founded upon a different factual predicate than was *Chaires I.*" We disagree.

In *Chaires I,* the Court of Appeals found that the Chaireses were estopped from asserting that Chevy Chase violated the SMLL, based on Mr. Chaires's actions as borrower, settlement attorney for the lender, settlement attorney for himself and his wife as borrowers, and as the agent for the title insurer. The Court found that there was a conflict of interest and his failure to disclose the existence of the prior shore lien on the property to the lender constituted inadequate disclosure, causing Chevy Chase to obtain a second rather than a first lien on the property. In finding that such acts estopped him from arguing Chevy Chase violated the SMLL, the Court of Appeals held:

> In the matter now before us the loan from B.F. Saul originated as one in the regular course of its business, but it deviated from that course. B.F. Saul furnished closing instructions to its settlement attorney, and the loan would have been one in ordinary course had those instructions been followed. The obstruction was the Shore Lien. Having in hand closing instructions that called for the documents necessary to effect a first lien, **Mr. Chaires did not fulfill his obligation of disclosure by relying on the reference to the Shore Lien in the commitment for title insurance.** Nor could he treat that reference as having generated the client's acquiescence in closing the transaction with the prior Shore Lien still in effect, particularly when the closing instructions directed elimination of the exception for the Shore Lien, as well as of the exception for any and all liens. **As attorney for the lender in the transaction, it was Mr. Chaires's duty, at a minimum, to bring the obstacle of the Shore Lien to the direct attention of an appropriate representative of B.F. Saul so that the lender could consider its options . . . .**

We assume, most favorably to the plaintiffs, that Mr. Chaires either failed to look at the SECL or attempted to write the policy around it in the hope that that would be acceptable to B.F. Saul. Chevy Chase concedes that the assertion by the Chaireses of claims under SMLL was the result of afterthought and not part of a plot at the time the loan was made. Nevertheless, estoppel does not require that the persons estopped intend the detriment that flows from their conduct.

Here, Mr. Chaires knew that the Loudon Lane property was subject to the Shore Lien. The estoppel results from the actual, and not simply potential, conflict existing when the loan was made. That lien secured a no interest loan from DNR on which, by Mr. Chaires's estimate, $15,000 to $17,000 remained to be paid as of the time of the B.F. Saul Loan. Thus, in addition to some $6,000 in fees and closing costs that the Chaireses would have to pay in order to borrow the $350,000 to repay Queenstown Bank, the Chaireses would have to produce an additional $15,000 to $17,000 in order to satisfy the objectives of Mr. Chaires's client, should the client decide not to make the loan unless the Shore Lien was released. **This conflict of interests places Mr. Chaires in a position where, whether intentionally or not, his inadequate disclosure in violation of his duty to the client operated for his benefit and that of Mrs. Chaires.**

* * *

Public policy is also invoked by the Chaireses who submit that estoppel cannot be applied to bar a claim based upon a statute that is intended to protect the party against whom estoppel is asserted. In making this argument Mr. Chaires seeks to don exclusively his hat as a borrower for consumer purposes, and he totally ignores his relationship to the lender as title and settlement attorney. It is the latter relationship that gives rise to the estoppel. *Messick v. Smith*, 193 Md. 659, 69 A.2d 478 (1949), *reh'g denied*, 193 Md. 659, 72 A.2d 249 (1950), on which the Chaireses rely,

does not involve estoppel and does not involve the attorney-client relationship. **Nor does the jury's finding that Chevy Chase "knowingly" violated SMLL prevent an estoppel from arising.** Under the facts of the instant matter estoppel was a legal question for the court to decide; there was no jury issue. [Emphasis added.]

*Chaires I*, 350 Md. at 742, 715 A.2d 199.

The Court of Appeals found that the Chaireses were estopped based on Mr. Chaires's actual conflict of interest and inadequate disclosure of the prior lien, from which the Chaireses benefitted. The essence of the estoppel was that Mr. Chaires's acts created the situation in which Chevy Chase found itself as the holder of a second lien subject to the SMLL. That undesired and unbargained for circumstance did not change as a result of *Chaires I*, which only confirmed that Chevy Chase's lien was a second lien. The fact that Chevy Chase then had actual knowledge that the mortgage was subject to SMLL did not in any way cure the impropriety of Mr. Chaires's conduct. Under these circumstances, as the Court of Appeals stated in *Chaires I*, a "finding that Chevy Chase 'knowingly' violated SMLL [does not] prevent an estoppel from arising."

We therefore find no error in the trial court's finding that the Chaireses were estopped from arguing violations of the SMLL by Chevy Chase.

## II.

■ Similarly, appellants argue that the trial court erred in finding the Nelsons' claims were barred by *res judicata*. They claim that the foreclosure action and the case at bar are "separate cases which involve different causes of action" in which the "[r]esolution of one of the cases could not affect the rights of the parties as to the other." Again, we disagree.

■ Appellants correctly state the elements required to support a *res judicata* defense, as "1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute, 2) that the claim presented in the current

action is identical to the one determined in the prior adjudication, and 3) that there was a valid final judgment on the merits." *Douglas v. First Sec. Federal Sav. Bank, Inc.*, 101 Md.App. 170, 181, 643 A.2d 920, *cert. denied*, 336 Md. 558, 649 A.2d 601 (1994), *and cert. denied*, 514 U.S. 1128, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995) (citing *Major v. First Virginia Bank*, 97 Md.App. 520, 533–34, 631 A.2d 127, *cert. denied*, 331 Md. 480, 628 A.2d 1067 (1993)). The *res judicata* analysis is straightforward when an earlier court has actually ruled on the matter litigated.

> It is when … the earlier court has not directly ruled upon the matter that the analysis becomes more complex, for then the second court must determine whether the matter currently before it was fairly included within the claim or action that was before the earlier court and could have been resolved in that court. It has long been established that a judgment between the same parties or their privies upon the same cause of action is conclusive 'not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit.'

*FWB Bank v. Richman*, 354 Md. 472, 493, 731 A.2d 916 (1999). Stated another way, the concept of *res judicata* can be described as: "a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit." *Rowland v. Harrison*, 320 Md. 223, 229, 577 A.2d 51 (1990).

Appellants agree that there is identity of the parties and the first element is satisfied. They argue, however, that the second element was not satisfied, as "foreclosure proceedings in reference to the Nelsons' home can hardly be thought of as an identical claim to those presented in the present action." We are not persuaded.

In their exceptions, the appellants claimed:

2. At the time of foreclosure, lender Chevy Chase FSB, which was conducting the foreclosure pursuant to the Deed of Trust by and through their trustee David N. Prensky, claimed that the Nelsons were approximately $4,000.00 in arrears on the Loan.

3. At the time of foreclosure, Chevy Chase owed the Nelsons $120,000.00 as a matter of law.

4. The $120,000 liability of Chevy chase to the Nelsons results from violations by Chevy Chase of Maryland's Commercial Law Article generally, and Title 10 specifically.

5. The facts and legal circumstances in support of the Nelsons' claim are specified in the Second Amendment to the Complaint, attached hereto, which has previously been filed in the Circuit Court for Prince Georges' County, case CAL 97–18995. Exhibit A hereto.

\* \* \*

Wherefore, Defendants respectfully request that their exception to the sale be granted, that ratification of the foreclosure sale be stayed and determined after resolution of their action in Case CAL 07–18995, or for such or different relief as the Court may determine to be appropriate.

In response, Chevy Chase claimed that although the foreclosure action was a distinct proceeding, separate and apart from appellants's civil suit, the same issues were raised in both proceedings. The Nelsons raised the claim of illegality of the fees in an attempt to dispute the charges and the amount owed. In fact, they refer to their complaint for the sole support of their exceptions to the foreclosure sale. The propriety of the fees and charges, as well as the amount owed under the mortgage were proper objections to make to a foreclosure sale, and appellants had an opportunity to both raise the issues and argue the merits before the court. Although the requested relief was different, the issues and factual circumstances surrounding the foreclosure action and

this action were identical. Contrary to appellants' assertion, the ratification of sale is more than declining to grant a stay. The ratification of a sale is *res judicata* as to the validity of the sale, except in case of fraud or illegality, and hence its regularity cannot be attacked in collateral proceedings. *Ed Jacobsen, Jr., Inc. v. Barrick*, 252 Md. 507, 511, 250 A.2d 646 (1969).

In *Fairfax Savings, F.S.B. v. Kris Jen Limited Partnership, et al.*, 338 Md. 1, 655 A.2d 1265 (1995), the Court of Appeals confronted a similar issue. In *Fairfax*, Kris Jen borrowed $3,200,000 from Fairfax Savings in order to construct eighteen luxury townhomes in Bel Air, Maryland. The loan was secured by a deed of trust on the property and personally guaranteed by Kris Jen's general partner and his wife. A year later, the loan was in default. Fairfax foreclosed on the property and the property was subsequently sold. A report of sale was filed with the court and Kris Jen filed exceptions. Prior to a hearing, Kris Jen withdrew his exceptions, and the court ratified the sale without discussion. While the foreclosure proceedings were underway, Kris Jen instituted a civil suit against Fairfax, alleging, among other things, that Fairfax engaged in fraud and misrepresentation, breached its duty of good faith and fair dealing, breached its fiduciary duty, and engaged in tortious interference, all of which essentially involved the "defense of no default." *Fairfax*, 338 Md. at 23, 655 A.2d 1265. After a lengthy discussion of claim preclusion, the Court of Appeals concluded:

> We have seen ... that, from the standpoint of Maryland procedure and based on Kris Jens' voluntary appearance [at the foreclosure sale], Kris Jen had the opportunity to litigate to judgment in the foreclosure action its defense that there was no foreclosure-triggering default....
>
> In any event, in the instant matter, a foreclosure-triggering default is a condition precedent to a Maryland mortgage foreclosure. Ordinarily the existence of that essential will be demonstrated by the statement of mortgage debt and by the mortgage that are required to accompany the order to docket the summary preceding. **Allegations that there**

was no foreclosure-triggering default negate, contradict, and in that sense nullify an essential foundation for the foreclosure judgment. Those allegations were precluded by the foreclosure judgment, and the circuit court correctly ruled that they should be culled from Plaintiffs' second amended complaint. [Emphasis added.]

*Fairfax,* 338 Md. at 31, 655 A.2d 1265.

We find this reasoning instructive. The Nelsons' claim of illegality of fees was in the nature of a no default defense by claiming an offsetting liability of Chevy Chase against the amount Chevy Chase claimed to be in arrears. Their theory was that if the Nelsons could have successfully proved that they were entitled to recover $120,000 in illegal fees collected by Chevy Chase, it would negate the fact that the Nelsons were $4,000 in default on the loan. Therefore, the Nelsons' claim of illegality is one that would "nullify" the foreclosure-triggering default. Consequently, the foreclosure proceeding was a proper forum for the Nelsons to assert such claims and the court's ratification of the sale is *res judicata* to these issues. *See also, Tri–Towns Shopping Center, Inc. v. First Federal Savings Bank of Western Maryland,* 114 Md.App. 63, 688 A.2d 998, *cert. denied,* 346 Md. 28, 694 A.2d 950 (1997)(relying on *Fairfax,* this Court found that the debtors' withdrawal of exceptions to a foreclosure sale pursuant to a settlement agreement constituted *res judicata* as to claims regarding purchase price of property and status as junior lienholders).

The Nelsons had an opportunity to appeal the final order ratifying the foreclosure sale. Their failure to do so precludes them from relitigating the issue.

### III.

Appellants next argue that the trial court erred in finding that the federal law preempted Maryland law in this case. The heart of their claim is that because each loan originated with Saul, the subsequent assignment of the notes to Chevy Chase, a federal lender, did not alter the original rights and obligations of the parties and does not subject

appellants to different legal standards. In light of our holding in I and II above, we will limit our discussion to the Foster loan.

Appellants' argument is based essentially on contract principles. They repeatedly assert that appellees "elected" Maryland law and waived federal protection, as evidenced by certain letters to the Maryland Commission and the language of the loan documents. They argue that the trial court erred when it "failed to consider that specific superceding terms were added to the loan documents by which the lenders elected that Maryland law controlled the transactions." Appellants also argue that the trial court erred in construing the choice of law provision in the documents, and that ambiguous provisions, such as the choice of law provision, should be interpreted by the intent of the parties. Contrary to appellants' argument that appellees elected Maryland law over federal law, the parties could not elect to have state law govern over federal law. The Code of Federal Regulations ("CFR"), 12 CFR § 560.2, expressly provides that the federal regulations occupy the entire field of federal lending, and the federal regulations are to be the governing laws for certain activities, including the charging of fees, by federal institutions. Section 560.2 provides:

12 CFR § 560.2 Applicability of law.

(a) *Occupation of field.* Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), **OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations** when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), **OTS hereby occupies the entire field of**

**lending regulation for federal savings associations.** OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, *federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110* [6] *of this part.* For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

(b) *Illustrative examples.* Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

(1) Licensing, registration, filings, or reports by creditors;

---

**6.** § 560.110 provides, in part,

§ 560.110 Most favored lender usury preemption.

(a) Definition. The term "interest" as used in 12 U.S.C. 1463(g) includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.

(b) Authority. A savings association located in a state may charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of that state. If state law permits different interest charges on specified classes of loans, a federal savings association making such loans is subject only to the provisions of state law relating to that class of loans that are material to the determination of the permitted interest.... Except as provided in this paragraph, the applicability of state law to Federal savings associations shall be determined in accordance with § 560.2 of this part. State supervisors determine the degree to which state-chartered savings associations must comply with state laws other than those imposing restrictions on interest, as defined in paragraph (a) of this section.

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

(3) Loan-to-value ratios;

(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) *Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;*

\* \* \*

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

\* \* \*

(c) *State laws that are not preempted.* State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

(1) Contract and commercial law;

(2) Real property law;

(3) Homestead laws specified in 12 U.S.C. 1462a(f);

(4) Tort law;

(5) Criminal law; and

(6) Any other law that OTS, upon review, finds:

(i) Furthers a vital state interest; and

(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes

expressed in paragraph (a) of this section. [Emphasis added.]

12 CFR § 560.2.

To be sure, certain state laws, including contract and commercial law requirements and, perhaps most important, state real property laws, may still be effective. Under 12 CFR § 560.2, however, the federal regulations expressly mandate that imposition of fees and other certain charges by federal lending institutions be governed by the federal regulations.

As the OTS stated in its promulgation ruling:

When confronted with interpretive questions under § 560.2, we anticipate that courts will, in accordance with well established principles of regulatory construction, look to the regulatory history of § 560.2 for guidance. **In this regard, OTS wishes to make clear that the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations.** When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption. [Emphasis added.]

61 Fed.Reg. 50951 at page 50966 (1996).

The next question then is whether the § 560.2 federal preemption for federal savings and loan institutions extends to subsidiaries, such as Saul, and whether such law was in effect at the time the Foster loan originated. We will discuss the specific fees and charges in section IV below.

The Foster loan originated in 1996. At that time, CFR § 559.3(h)(1) provided: "(1) Unless otherwise specifically provided by statute, regulation, or OTS policy, all federal statutes and regulations apply to operating subsidiaries in the same manner as they apply to [federal savings and loan institution]." Further, section 559.3(n)(1) provided "State law applies to operating subsidiaries only to the extent it applies to [federal savings and loan institution]." *See,* 61 FR 66561 at 66571. These regulations were in effect when the Foster loan originated in 1996. Therefore, since the Foster loan originated with Saul, a subsidiary of Chevy Chase, it has always been subject to the federal preemption provisions as they are set for federal savings and loans.

As stated in section 560.2, some state laws are not preempted by the federal regulations. Therefore, it is reasonable that parties would include a choice of law provision, specifying which state law will govern the remaining aspects of the lending contract. Appellants cite numerous documents to support their proposition that appellees elected Maryland law over federal law. However, upon careful examination of these documents, it appears that the appellees were not attempting to opt for Maryland law over federal law, but were attempting to include a choice of law provision to govern the areas not preempted by the federal regulations. Appellees could not and were not waiving any federal protections.

In fact, appellants cite a December 5, 1990 letter written by Chevy Chase as evidence of appellees "unequivocal election . . . that Maryland law was to apply to all such loans." [7] They argue that through this letter, appellees defended its procedures as being in compliance with Maryland law. Appellants misread the letter. The letter provides:

> [Saul], as a wholly owned subsidiary of the ultimate lender, did not act as a "broker" in these transactions.

---

7. The letter was written by counsel for Chevy Chase Bank on behalf of Saul in response to the Maryland Mortgage Lender's examination of Saul.

Instead, it acted merely as the agent of Chevy Chase for the purpose of origination and processing mortgage loans.

Under federal laws and regulations, a savings bank's subsidiaries are treated for many purposes as equivalent to the institution itself.... Also, we feel it is important to understand that [Saul] originated mortgage loans solely for its parent—that it did not at any time provide these services for any other lender. Accordingly, [Saul] is only a corporate alter-ego, performing services for the sole convenience of its parent.

* * *

We agree that some loan documents did not indicate that Title 12 of Subtitle 10 of the Commercial Law Article applied, and have taken steps to revise the documents accordingly.

Contrary to appellants' assertion, appellees did not defend their procedures as being in compliance with Maryland law, but sought to distinguish Saul's practices and prove that COMAR regulations did not apply. In fact, Chevy Chase argued that Saul was acting on behalf of Chevy Chase, its parent company, and was governed by applicable federal regulations.

Appellants also cite the letter dated September 6, 1990 and language from the Foster deed as evidence of appellees' "unequivocal election ... that Maryland law was to apply to all such loans," arguing that appellees reported to the Maryland regulators that a "statement was being placed on all deeds of trusts that identified State law as controlling."

The Foster deed included the following provision: "This loan transaction is governed by Title 12, Subtitle 10 of the Commercial Law Article of the Annotated Code of Maryland." The September 6, 1990 letter provided:

On each security instrument (deed of trust) the state, in which the property is located, is referenced as the one whose laws govern the transaction.... In addition,

FNMA/FHLMC uniform instruments (deeds of trust) disclose in paragraph 15 which law governs the transaction.

\* \* \*

Loans are originated under Title 12, subtitle 10 of the Commercial Law article of the Maryland Code. B.F. Saul Mortgage Company is a wholly owned subsidiary of Chevy Chase FSB and acts in their behalf in collecting fees, which are not prohibited by applicable law. B.F. Saul Mortgage Company does not transact with any other lender in this manner. B.F. Saul Mortgage Company is now closing loans in its own name to eliminate this concern.

The cited deed language, as well as the September 6, 1990 letter, simply indicate that appellees were electing to have the Maryland law govern the non-regulated portions of the contract. Although appellees could have utilized a more general choice of law language in the documents and letters, appellees did not, as they could not, elect state law over federal law for all aspects of the loan contract.

## IV.

Appellants next argue that the trial court failed to consider the individual claims being asserted against the appellees in determining federal preemption. Appellants argue that the trial court failed to consider "the circumstances involving [ ] the individual loans, the character of the charges alleged to be illegal, and whether the preemption regulations were applicable to these loans." In light of our holdings in I, II, and III above, we again limit our discussion to the character of the alleged charges regarding the Foster loan.

Foster complains that appellees required him to obtain excessive insurance, in an amount in excess of the replacement value of the improvements on the real property. He also argues that appellees imposed illegal charges, including: insufficient fund charges, property inspection fees, and settlement fees. In his complaint, he categorizes the settlement fees as follows:

As evidenced by the "Settlement Statement" dated 12–19–96, [Saul] illegally collected and charged Mr. Foster the following amounts, all in violation of Md.Code Ann., Comm. Law II § 12–1005:

a) "Tax Serv. Fee" of $78.00;

b) "Document fee" of 350.00;

c) "Underwriting Fee" of 350.00;

d) "Courier Fee" of $35.00; and

e) In-house Appraisal fee of 200.00.

Appellants also allege that appellees' requirement that funds be paid by certified check constituted an illegal additional fee. We find that all these charges are governed by the federal regulations and therefore the trial court properly granted summary judgment on the issue of federal preemption.

Section 560.2(b)(4) specifically allows the federal lending institutions to impose requirements regarding "the terms of credit ..." Section 560.2(b)(10) preempts any state regulations regarding "processing, origination, servicing, or purchase of, or investment or participation in mortgages." We believe that a property insurance requirement is a condition of the loan, and thus, a term of credit, which preempts state law regulations. This is consistent with an OTS advisory letter dated March 10, 1999, regarding the legality of the California Unfair Competition Act, in which the OTS reaffirmed that "... OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations. *Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are preempted by federal law.*" (Emphasis added). Therefore, we hold that Foster's complaint regarding insurance is preempted by § 560.2 of the federal regulations.

Foster's complaints regarding settlement fees and not sufficient funds charges also fall within the federal mandate. Section 560.2(b) gives explicit examples of state laws that are preempted by the federal regulations. This includes

the imposition of "loan related fees, including without limitation, *initial charges*, late fees, prepayment penalties, servicing fees, and overlimit fees." 12 CFR § 560.2(b)(5). (Emphasis added). The property inspection fees and settlement related fees, including the tax service fee, documentation fees, underwriting fees, appraisal fees, and courier fees, were one-time charges, and fall within the definition of initial charges, which are controlled by the federal regulations. Further, not sufficient funds charges are encompassed in the definition of "interest" in § 560.110, and therefore also governed by the federal regulations.

Additionally, Foster complains that appellees' requirement that certain funds be paid by certified check constituted the imposition of additional illegal fees. Again, we disagree. The requirement that the funds be paid by certified check was initially imposed only when the loan was in default for two or more months, and Foster had the opportunity to reinstate the loan upon payment in full. By letter dated April 27, 1998, Chevy Chase requested that all future payments be made by certified check, cashier's check, or money order, as another mortgage payment had been returned to them due to insufficient funds. We find that this too is an acceptable requirement in light of Foster's past history of non-payment or payment with insufficient funds and it is not an illegal fee.

## V.

Finally, appellants argue that the trial court abused its discretion in refusing to allow appellants the opportunity to conduct discovery prior to the resolution of the summary judgment motion. They argue that the trial court "summarily dismissed" their request that appellees' motion for summary judgment be stayed until their requests for discovery had been answered, and proceeded to consider the matter upon an incomplete factual record.

In their Response to the appellees' first motion for summary judgment,[8] appellants stated:

---

**8.** This language appears only in appellants' Response to the first motion for summary judgment. Appellants did not request a continuance or

5. Affidavit of Defense Not Available pursuant to Maryland Rule 2–501(d): I, William M. Chaires, being over eighteen years of age and competent to testify on personal knowledge, state that facts essential to opposition of Defendant's Motion cannot be set forth for reasons stated in this Response.

Appellants are correct that they may request a continuance pending the outcome of discovery pursuant to Rule 2–501(d).[9] The authority to grant a continuance, however, is discretionary. "The timing of a summary judgment ruling, i.e., whether it is to be postponed pending completion of discovery or denied in favor of submission to the fact-finder, falls within the trial court's discretion and will be reviewed only for abuse." Paul Niemeyer & Linda Schuett, MARYLAND RULES COMMENTARY, Rule 2–501, at 95 (2nd ed.1992, Supp.1998).

 "When granting a motion for summary judgment, a trial court makes rulings as a matter of law, resolving no disputed issues of fact. The standard for appellate review of a trial court's grant or denial of a motion for summary judgment is whether the trial court was legally correct." *Nationwide Ins. Companies v. Rhodes*, 127 Md.App. 231, 732 A.2d 388 (1999)(internal citations omitted).

As we stated above, we find that the trial court was legally correct in its analysis of the federal regulations and the state law preemption issue. The trial court had sufficient informa-

---

include any affidavit pursuant to Rule 2–501(d) in their subsequent Response to appellees' second motion for summary judgment. However, because the second motion for summary judgment appears to incorporate the first motion as well as address the addition of Foster as a plaintiff in the suit, we will view the first and second motion for summary judgment and appellants' responses as one.

9. Rule 2–501(d) provides:

(d) Affidavit of Defense Not Available.—If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the *facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted* or may enter any other order that justice requires. [Emphasis added.]

tion before it to rule on the legal issues presented, and therefore it was not an abuse of discretion to deny a continuance pending further discovery. Additional discovery would have been potentially burdensome and would have unnecessarily delayed the resolution of the issues. We find no error in the trial court's denial of appellants' request for a stay and its grant of summary judgment on the facts as presented.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**