832 A.2d 812

**Dale WELLS, et al.**

**v.**

**CHEVY CHASE BANK, F.S.B., et al.**

**No. 41 Sept. Term 2002.**

Court of Appeals of Maryland.

Sept. 23, 2003.

F. Paul Bland, Jr. (Leslie Bruekner of Trial Lawyers for Public Justice of Washington, DC,; John T. Ward, Robert B. Kershaw of Ward Kershaw, P.A. of Baltimore; Michael P. Malakoff of Malakoff, Doyle & Finberg, P.C. of Pittsburgh, PA), on brief, for appellants.

David J. Cynamon (Erica S. Simpson of Shaw Pittman LLP, on brief), Washington, DC, for appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

In this case, we are asked to resolve whether a credit-card agreement (the "Cardholder Agreement"), between Dale Wells, Sharon Goldenberg and John Dovel, the appellants, and Chevy Chase Bank, F.S.B. and U.S.A. Bank, N.A., the appellees, contractually bound the appellees to comply with provisions of Subtitle 9, which address the form of the notice required when a Cardholder Agreement is amended, where the Cardholder Agreement in the section captioned "Governing Law," references Subtitle 9 of the Commercial Law Article, Md.Code (1975, 2000 Repl.Vol.), §§ 12–901—12–924 of the Commercial Law Article ("Subtitle 9") and "applicable federal law." Although the parties agree that State laws purporting to regulate the appellees' lending activities have been preempted by § 5(a) of the Homeowners Loan Act ("HOLA") 12 U.S.C. 1464(a) and its implementing regulations, *see* 12 C.F.R. pt. 560, the appellants characterize the reference to Subtitle 9 in the Cardholder Agreement as a provision in a

contract, which, notwithstanding federal preemption, defines a particular aspect of the relationship between the parties, the manner in which notice is to be given when the Cardholder Agreement is amended. Consequently, rather than because it was a failure to comply with state law, the appellants seek to recover damages from the appellees for breach of their contract with the appellants to comply with Subtitle 9 when amending the Cardholder Agreement. The Circuit Court for Baltimore City observed that it "seems both implausible and inconsistent with federal preemption to claim that a state regulatory scheme was agreed to between [the] parties by a mere reference to Subtitle 9" and, thus, rejected the appellants' argument. We do not agree. Accordingly, we shall reverse and remand the case to the Circuit Court for further proceedings.

## I.

This is not the first occasion on which this case, the parties to it and the issues presented by it, have been before this Court. *Wells v. Chevy Chase Bank, F.S.B., et al.,* 363 Md. 232, 768 A.2d 620 (2001) (*"Wells I"*) was an appeal taken from an order compelling arbitration. Preparatory to addressing the substantive issue that case presented, whether the appellants agreed to arbitrate, we summarized the factual and procedural history of the case:

> "Plaintiffs' first amended complaint alleges that the Defendants, in a number of aspects, breached the open end credit agreement (the Cardholder Agreement) in effect between Plaintiffs, as cardholders of credit cards issued by Chevy Chase, and Chevy Chase, as card-issuing credit grantor. "Prior to January 16, 1996, Chevy Chase had maintained its home office in Maryland.[1] The Cardholder Agreement provided for an annual fee, a minimum late charge fee of fifteen

---

1. Regulations of the Office of Thrift Supervision, United States Department of the Treasury, state that "[a]ll operations of a Federal savings association shall be subject to direction from the home office." 12 C.F.R. § 545.91.

dollars, described the method of computing the finance charge, and stated that the 'ANNUAL PERCENTAGE RATE will never exceed 24%' With respect to amendments the Cardholder Agreement read:

> 'We may amend the terms of this Agreement in accordance with applicable law at any time. Also we may at any time add new credit services, discontinue any credit services, or replace your card with another card.'

"The Cardholder Agreement also contained a 'Governing Law' provision reading:

> 'This Agreement is made in Maryland. It is governed by Subtitle 9 ['Credit Grantor Revolving Credit Provisions'] of Title 12 ['Credit Regulations'] of the Commercial Law Article of the Maryland Annotated Code and applicable federal laws.'

"There was no mediation or arbitration provision in the Cardholder Agreement.

"On or about January 16, 1996, Chevy Chase moved its home office to Virginia. With the periodic statements mailed in January and February of 1996 to its cardholders, Chevy Chase included a notice of change of terms of the Cardholder Agreement. The notice of change took the form of a restatement and revision of the Cardholder Agreement, with the new or revised terms italicized and, with respect to a waiver of jury trial provision, both italics and all upper-case print was used. Solely for purposes of this appeal, and without indicating any opinion on whether the Cardholder Agreement was effectively amended or whether the amendments are substantively valid, we shall call the product of the January and February mailings the 'Amended Agreement.' The Amended Agreement provided that it was made in Virginia and was 'subject to and governed by Virginia law and applicable federal law and regulations.' The Amended Agreement further recited that '[t]he parties agree that by engaging in activities with or involving each other, they are participating in transactions involving interstate commerce.'

"Also contained in the Amended Agreement was an alternative dispute resolution section which in relevant part reads:

'Mediation and Arbitration—Any controversy or claim ("Claim") between or among you and us or our agents, employees and affiliates, including but not limited to those arising out of or relating to this Agreement or any related agreements, including without limitation any Claim based on or arising from an alleged tort, shall, at the request and expense of the claiming party, be submitted to mediation, using the rules of the American Arbitration Association ("AAA").'

'If mediation fails to resolve the Claim within 30 days from the date of engagement, then the Claim shall be determined by binding arbitration. (Mediation or Arbitration, as appropriate, are sometimes referred to below as the 'Proceeding'.) Arbitration shall be conducted in accordance with the United States Arbitration Act (Title 9, U.S.Code), notwithstanding any choice of law provision in this Agreement, and under the rules of the AAA. Either you or we may, by summary proceedings (e.g., a plea in abatement or motion to stay further proceedings), bring an action in any court having jurisdiction for the sole purpose of compelling compliance with these mediation and arbitration provisions.'

"On or about September 30, 1998, First U.S.A.[2] purchased the credit card portfolio of Chevy Chase.

"Plaintiffs instituted the ... action [in *Wells I* ] in January 1999. They allege that the defendants breached the Cardholder Agreement by charging interest in excess of twenty-four percent, by increasing the interest on past balances, by failing to provide legally required notice of the amendments, by changing the method of calculating the finance charge without proper notice, and by increasing the late fees and over-limit fees without proper notice. Plaintiffs also allege violation of the Maryland Consumer Protection Act, Mary-

---

**2.** One of the appellee's in the case *sub judice*

land Code (2000 Repl.Vol.), §§ 13–101(d) and 13–303(3) of the Commercial Law Article (CL)."

*Wells I*, 363 Md. at 235–37, 768 A.2d at 621–22 (footnote omitted). This history applies as well to the case *sub judice*.

The Court identified the principal theory of the appellants' case as being that the Cardholder Agreement had not been effectively amended and elucidated the supporting rationale underlying it:

"Plaintiffs principally rely on CL § 12–912 that addresses amendment of the agreement governing a revolving credit plan. In broad strokes, that section requires, 'at least 25 days before the effective date of the amendment,' a clear and conspicuous written notice, 'if the amendment has the effect of increasing the interest, finance charges, or other fees and charges to be paid by the borrower . . . or altering the manner of their computation.' § 12–912(b)(1). The notice must include '[a] clear statement comparing the original terms and the terms under the amended agreement.' § 12–912(b)(1)(i). The initial notice is also to include 'a statement that a second notice will be sent in the borrower's next periodic statement.' § 12–912(c)(7). Both notices are to be in ten point type. Id. The notice is to advise of the cardholder's optional right to refuse the amendment and to describe the manner of refusing. § 12–912(c)(7)(ii). Where, as here, the plan charges an annual fee, rejection of the amendment entitles the cardholder to 'use the account pursuant to its original, unamended terms, for . . . the duration of the time for which a fee was paid for use of the plan.' § 12–912(c)(5)(i)1.

"In addition, § 12–912(e) provides:

'If the terms of the agreement governing the plan, as originally drawn or amended[,] provide, any amendment may, on or after the date on which it becomes effective as to a particular borrower, apply to all then outstanding unpaid indebtedness in the borrower's account under the plan, including any indebtedness which shall have arisen

out of purchases made or loans obtained prior to the effective date of the amendment.' "

*Wells I*, 363 Md. at 237–38, 768 A.2d at 622–23.

We noted, that in addition to moving to compel arbitration, the appellees also argued in the trial court that § 12–912, on which the appellants principally relied, was preempted by 12 C.F.R. § 560.2(a), a regulation of the Office of Thrift Supervision (OTS) that undertakes to "occupy[] the entire field of lending regulation for federal savings associations." *Id.* As indicated, the motion to compel arbitration prevailed in the trial court, prompting the appellants' appeal.

In response, the appellees moved to dismiss the appeal, arguing that the Maryland law permitting an appeal from an order compelling arbitration was, itself, preempted by 9 U.S.C. § 16(b)(2) of the Federal Arbitration Act. This preliminary procedural issue, *see Wells I*, 363 Md. at 235, 768 A.2d at 621, was premised on the fact that the arbitration order " 'was entered in the context of a larger breach of contract dispute, the arbitration issue was 'embedded' in appellants' contract and state statutory claims, and therefore the Arbitration Order is not an appealable 'final decision' for purposes of FAA § 16.' " *Wells I*, 363 Md. at 242, 768 A.2d at 625, quoting the appellees' brief, which cited *In re Pisgah Contractors*, 117 F.3d 133, 136 (4th Cir.1997).[3]

---

3. Pursuant to 9 U.S.C. 16(a)(3), "an appeal may be taken from ... a final decision with respect to an arbitration that is subject to this title." Despite this apparently clear direction, the appellees relied on a definition of "final decision" drawn by some federal cases, "one that resolves an 'independent' action, in which the 'sole issue before the district court is the arbitrability of the [underlying] dispute.' " *Wells v. Chevy Chase Bank, F.S.B., et al.*, 363 Md. 232, 241–42, 768 A.2d 620, 625 (2001), quoting the appellees's brief, which, in turn, quoted *In re Pisgah Contractors*, 117 F.3d 133, 136[ (4th Cir.1997) (quoting *Humphrey v. Prudential Sec., Inc.*, 4 F.3d 313, 317 (4th Cir.1993)). Thus, the appellees argue, citing *Pisgah* and *American Cas. Co. v. L–J, Inc.*, 35 F.3d 133, 136 (4th Cir.1994), "Where arbitration is only 'one issue among others for the district court to resolve,' the arbitration issue is considered to be 'embedded,' and an order compelling arbitration in such a case is an unappealable interlocutory order within the meaning

The Court resolved both the preliminary procedural issue and the substantive issue in favor of the appellants and, thus, reversed the judgment of the Circuit Court. As to whether the parties agreed to arbitrate, it reasoned:

> "The arbitration clause in the Amended Agreement in this case is susceptible of but one reasonable interpretation. The promise is to mediate and, if necessary, arbitrate 'at the request and expense of the claiming party.' The Plaintiffs are the claiming parties, not the Defendants. This conclusion is neither altered, nor the language made ambiguous, by the provision in the next following paragraph reading: 'Either you or we may, by summary proceedings (e.g., a plea in abatement or motion to stay further proceedings), bring an action in any court having jurisdiction for the sole purpose of compelling compliance with these mediation and arbitration provisions.' Ordering the claiming party to mediate and, 'if mediation fails' to arbitrate, when the claiming party has not requested mediation does not compel compliance with the mediation and arbitration clause provisions; rather, an order so compelling exceeds those provisions."

*Wells I,* 363 Md. at 251–52, 768 A.2d at 630.[4]

Therefore, the issue we resolved in *Wells I,* related solely to whether "the appellants ... agreed to arbitrate,"[5] *id.* at 235,

---

of FAA § 16(b), even if the order compels arbitration of all substantive claims involved in the dispute."

**4.** Neither party argued the plain meaning of the contract. We noted, however, our discretion to consider the argument, even if a new issue, especially when to do so avoids the need to decide a constitutional issue, in this case, the preemption of § 12–912. *Wells I,* 363 Md. at 252, 768 A.2d at 631, citing *Baltimore Sun Co. v. Mayor & City Council of Baltimore,* 359 Md. 653, 659, 755 A.2d 1130, 1133–34 (2000); *Professional Staff Nurses Ass'n v. Dimensions Health Corp.,* 346 Md. 132, 138–40, 695 A.2d 158, 160–61 (1997).

**5.** As we explained, the appellees defended against the complaint in *Wells I* "by moving, pursuant to the [Federal Arbitration Act], to compel mediation/arbitration in accordance with the Amended Agreement." *Id.* at 238, 768 A.2d at 623. The trial court granted the appellees' Motion to Compel Arbitration, whereupon the appellants noted an appeal from the trial court's order compelling arbitration. Responding

768 A.2d at 621. This was an issue related to, but different from the issue the parties principally argued which was whether the appellees' attempt to amend the Cardholder Agreement was effective. Although, the gravamen of the complaint in *Wells I,* as it is in the case *sub judice,* centered on that latter question, this Court did not address it. Indeed, we expressly did not venture an opinion as to "whether the Cardholder Agreement was effectively amended or whether the amendments are substantively valid." *Id.* at 236, 768 A.2d at 622.

On remand, the question of whether arbitration was a requirement having already been decided was squarely before the court for resolution. As they had done in the earlier action, the appellants argued that the Cardholder Agreement had not been amended effectively and that the appellees, therefore were in breach of the contractual terms of the unamended Cardholder Agreement. Once again, the appellants relied on the Governing Law provision of the Agreement, emphasizing that provision's reference to "Subtitle 9 of Title 12 of the Commercial Law Article of the Maryland Annotated Code."

The Circuit Court for Baltimore City, agreeing that appellants' claims are preempted by federal law, granted the appellees' motion to dismiss. It opined:

"[I]t is both ingenuous, and a trifle disingenuous to, to admit that the specific state imposed notice restrictions are preempted by federal law, while at the same time contend that the general reference to Maryland law, as the governing law, specifically reincorporates into the Cardholder Agreement these provisions as private agreements. It seems both implausible and inconsistent with federal preemption to claim that a state regulatory scheme was agreed to between the parties by the mere reference to Subtitle 9.

---

to the appeal, the appellees filed a Motion to Dismiss the Appeal arguing "[b]ecause the Arbitration Order here was entered in the context of a larger breach of contract dispute, the arbitration issue was 'embedded' in appellants' contract and state statutory claim, and therefore the Arbitration Order is not an appealable 'final order' for purposes of the FAA § 16."

This is a great deal beyond the scope of preserving the traditional infrastructure of state laws that undergird commercial transactions.

\* \* \* \*

"This court is convinced that to permit [appellants] to thwart the admitted preemption of the relevant law solely because of a general reference to Maryland law, flies in the face of common sense and contract interpretation. When the parties mentioned Subtitle 9 [of Title 12] of the Maryland Code and "applicable federal law" as governing law, they did not incorporate the protections of a Maryland regulatory scheme into the agreement. Had they meant to do that, they could have done so in clear-cut terms. As the *Chaires* [*v. Chevy Chase Bank*, 131 Md.App. 64, 748 A.2d 34 (2000), *cert. denied*, 359 Md. 334, 753 A.2d 1031 (2000),] case makes clear, they could not waive federal preemption and could only have intended that state law apply as 'governing law' should 'federal law' not apply. There is no basis for claiming that they entered into a private agreement incorporating a complex and detailed state regulatory scheme."

The appellants noted an appeal to the Court of Special Appeals and this Court issued, on its own initiative, a Writ of Certiorari, *Wells v. Chevy Chase*, 369 Md. 570, 801 A.2d 1031 (2002), prior to any proceedings in the intermediate appellate court.

■ Although, the appellants agree that Subtitle 9 is preempted by HOLA and its implementing regulations, they nevertheless insist that the appellees' agreement to comply with that subtitle's relevant notice provisions and protections may still be enforced. The appellants argue, in other words, that while Subtitle 9 may not be invoked to evaluate the adequacy of a credit agreement where there is no agreement by the parties as to its applicability, when there is such an agreement, federal preemption cannot negate the appellees' promise. They rely on *American Airlines v. Wolens*, 513 U.S. 219, 228–29, 115 S.Ct. 817, 823–824, 130 L.Ed.2d 715, 725–726

(1995), which they submit stands for the proposition that parties to a commercial transaction may elect, as a self-imposed, voluntary undertaking, to follow otherwise preempted state law and thus preserve state law claims for breach of contract. The appellants also find support for their position in 12 C.F.R. § 560.2. Section (c) of that regulation exempts, *inter alia*, contract and commercial laws "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." Consequently, they argue that the claims they advance have been expressly excluded from the preemptive scope of HOLA and the OTS regulations.

The appellees rejoin that the appellants have misinterpreted the governing law provision of the Cardholder Agreement. Specifically, they characterize the appellants' argument that the parties agreed to a notice regime prescribed by an otherwise preempted statute as an "attempt to impose Subtitle 9's preempted regulatory requirements on Chevy Chase through the back door of the choice-of-law provision in the Cardholder Agreement." The appellants' contract claim would not exist, they argue, if the requirements of Subtitle 9 are not imposed on Chevy Chase. Furthermore, they submit that a mere reference in the 'governing law" provision of the Cardholder Agreement is insufficient to transform a preempted state law into a private contract. With respect to the exception to preemption recognized in 12 C.F.R. § 560.2(c), they point out that, in 61 Fed.Reg. 50951, 50966 (1966), the OTS noted the narrowness of the exception:

> "OTS wishes to make clear that the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations.... For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption."

The appellees rely on *Chaires v. Chevy Chase Bank*, 131 Md.App. 64, 748 A.2d 34, *cert. denied*, 359 Md. 334, 753 A.2d

1031 (2000), which they contend rejected the precise argument, on virtually identical facts, being made by the appellants. It also was correctly decided, they maintain.

The appellants' reliance on the Supreme Court's holding in *Wolens* is rejected by the appellees as being "unsupported by an analysis of the holding in that case." Contending that, if relevant, it supports their position, the appellees argue (citing *Wolens*, 513 U.S. at 233, 115 S.Ct. at 826–827, 130 L.Ed.2d at 728–729) "[t]he Supreme Court held in *Wolens* that claims based on state laws or policies external to a contract, as opposed to the express terms of the contract, are preempted by governing federal law.... [The appellants'] claims in this case are premised entirely on the terms of Subtitle 9, all of which are external to the Cardholder Agreement itself. Thus, those claims are preempted."

## II.

■ The federal preemption doctrine has its origin in the Supremacy Clause of the United States Constitution. *See,* U.S. Const., Art. VI, cl. 2. That Clause provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding."

The constitutional mandate imposed on this Court by the Supremacy Clause requires this Court to declare state law unenforceable to the extent that federal law expressly so provides or the circumstances indicate that federal law supercedes state law.

■ The rules governing preemption are well settled.[6] Preemption may occur in one of three ways. Where Congress

---

6. While the law may be settled, the Supreme Court recently remarked:

has expressly stated its intent to preempt state law, federal law prevails. *Law v. Int'l Union of Operating Engineers Local No. 37, AFL–CIO,* 373 Md. 459, 467, 818 A.2d 1136, 1141 (2003) (citing *Harrison v. Schwartz,* 319 Md. 360, 364, 572 A.2d 528, 530, *cert. denied,* 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 110 (1990)); *see also, Becker v. Litty,* 318 Md. 76, 86, 566 A.2d 1101, 1106 (1989). Preemption of state laws also may still occur, even where Congress has not expressly stated its intention in that regard, if there is evidence of Congress' intent to "occupy a given field," and the state law falls within that field. *Harrison,* 319 Md. at 364, 572 A.2d at 530. Finally, state law is preempted when "compliance with both federal and state law is a physical impossibility." *Law,* 373 Md. at 466–67, 818 A.2d at 1141 (2003) (citing *Sanders v. State,* 57 Md.App. 156, 167, 469 A.2d 476, 482, *cert. denied,* 299 Md. 656, 474 A.2d 1345 (1984).

■ Determining whether a state law has been preempted by federal law is ordinarily a question of "congressional intent." *Fidelity Federal Savings and Loan Assoc., et. al., v. de la Cuesta, et al.,* 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674 (1982); *see also, Barnett Bank N.A., v. Nelson,* 517 U.S. 25, 30, 116 S.Ct. 1103, 1107, 134 L.Ed.2d 237, 243 (1996) ("[The preemption] question is basically one of congressional intent"); *FMC Corp., v. Holliday,* 498 U.S. 52, 56, 111 S.Ct. 403, 407, 112 L.Ed.2d 356, 363 (1990) ("in determining whether federal law preempts a state statute, we look to congressional intent."); *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443, 450 (1978) ("The purpose of Congress is the ultimate touchstone" of preemption analysis.) (quoting *Retail Clerks Int'l Assoc. v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179, 184 (1963)).

■ Moreover,

---

"This relatively clear and simple mandate has generated considerable discussion in cases where we have had to discern whether Congress has preempted state action in a particular area." *Lorillard Tobacco Co., v. Reilly,* 533 U.S. 525, 540, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532, 550 (2001).

"[f]ederal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. *United States v. Shimer*, 367 U.S. 374, 381–382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1962). When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited:

> 'If [his] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned. *Id.* at 383, 81 S.Ct. 1554.' "

*de la Cuesta, supra*, 458 U.S. at 153–154, 102 S.Ct. at 3022–3023, 73 L.Ed.2d at 675. When reviewing the preemptive effect of federal regulations on state laws, a court must not confine its inquiry to whether Congress intended to preempt state law. Rather, the appropriate inquiry, the Court instructs, considers whether the administrative agency intended to preempt state law and whether the action taken was within the delegation of authority by Congress. *Id.,* at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 676.

In this case, we are concerned with Congressional intent in enacting the HOLA and the intent of the OTS, the federal agency charged with administering the HOLA, when it promulgated the regulations to implement that act. The HOLA was enacted by Congress largely in response to the effect the Great Depression had on the national housing market. *See generally, Glendale Federal Savings & Loan Assoc. v. Fox,* 459 F.Supp. 903, 908 (C.D.Cal.1978). Its purposes were:

> " 'To provide emergency relief with respect to home mortgage indebtedness, to refinance home mortgages, to extend relief to the owners of homes occupied by them and who are unable to amortize their debt elsewhere, to amend the Federal Home Loan bank Act, to increase the market for

obligations of the United States and for other purposes.' Preamble, 48 Stat. 128 (1933)."

A significant component of HOLA was the creation of a "system of federal savings and loans associations." *Id.* at 909. Rather than subject the operation of federal savings and loans associations to state regulation, much of which was "ill-advised" and the object of the remedial legislation, Congress created the Home Owners' Loan Corporation, the predecessor of the Office of Thrift Supervision, *id.* at 908, and "gave the Bank Board plenary authority over the creation and operation of federal associations." *Id.* at 909. *See* § 5(a), which provides:

"In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known 'Federal Savings and Loan Associations", and to issue charters therefor, giving primary consideration to the best practices of local mutual thrifts and home-financing institutions in the United States. 12 U.S.C. § 1464(a)."

Thus,

"Federal savings and loan associations were not to be operated and regulated by what a particular state conceived to be the 'best practices.' Rather, the Bank Board was delegated by Congress the authority to select from the prevailing practices in all states what it deemed the best practices and to prescribe a nationwide system of operation, supervision, and regulation which would apply to all federal associations."

*Glendale Federal,* 459 F.Supp. at 909.

Comprehensive rules and regulations have been adopted by OTS and its predecessor agency concerning the "powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *de la Cuesta, supra,* 458 U.S. at 145, 102 S.Ct. at 3018, 73 L.Ed.2d at 669, citing *California*

*v. Coast Fed. Sav. & Loan Ass'n,* 98 F.Supp. 311, 316 (S.D.Cal. 1951). Critically important to the analysis that governs the dispute *sub judice* is, as we have seen, 12 C.F.R. § 560.2 (2002),[7] promulgated by the OTS.

Section (a) of the regulation makes clear that OTS intended to occupy the "entire field of lending regulations for federal

---

7. As relevant, 12 C.F.R. § 560.2 (2002) provides:

"(a) Occupation of field. Pursuant to section 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulations for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, a federal savings association may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision.

"(b) Illustrative examples. Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

"(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or terms of maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

"(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit applications forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

"(c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

"(1) Contract and commercial law."

savings associations" and that the regulations it promulgated would preempt state laws, defined as "any state statute, regulation, ruling, order or judicial decision," affecting operation of federal savings associations "when deemed appropriate to facilitate the safe and sound operation of federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA." The kinds of laws preempted are illustrated in section (b), including those purporting to impose requirements regarding the terms of credit and disclosure and advertising. *See* 12 C.F.R § 560.2(b)(4) and 12 C.F.R. § 560.2(b)(9). Section (c) exempts from preemption those state laws that only incidentally affect lending operations or that are consistent with section (a)'s purpose of "giv[ing] federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation."

Subtitle 9, the Maryland statute at issue in the case, contains the "Credit Grantor Revolving Credit Provisions." The term "Revolving credit plan" is defined to

"mean a plan that contemplates the extension of credit under an account governed by an agreement between the credit grantor and a borrower under which:

"(1) the credit grantor permits the borrower and, if the agreement governing the plan permits, persons acting on behalf of or with the authorization from the borrower to make purchases or obtain loans from time to time;

"(2) The amounts of purchases and loans are charged to the borrower's account;

"(3) The borrower is required to pay the credit grantor the amounts of all purchases and loans charged to the borrower's account under he plan but has the privilege of paying amounts due from time to time as agreed; and

"(4) Interest or finance charges may be charged and collected by the credit grantor from time to time on the amounts due under the plan."

Md.Code (1975, 2000 Repl.Vol.), § 12–901(e) of the Commercial Law Article. Additional statutory provisions in Subtitle 9 provide explicit directives for the regulation of revolving credit plans in the State of Maryland, including, without limitation, variation in interest rates, the amount of fees and charges that may be imposed, and procedures for amending revolving credit plans. Because they impact how credit grantors may operate and conduct their lending activities, which is inconsistent with OTS's expressed intention to "occupy the entire field of lending regulation for federal savings associations," any attempt to enforce these provisions as a matter of State law and as additional requirements of a credit agreement with a federal savings association must fail. The appellees appropriately conceded that Subtitle 9 *qua* Subtitle 9 is preempted.[8]

Notwithstanding the concession, the appellants pursue the appellees on a breach of contract theory. The issue that must be resolved, therefore, is whether the cause of action, or at least, the basis for the claimed breach, is preempted.

The cause of action is not preempted. The OTS regulations expressly exempt from preemption "contract and commercial law . . . that . . . only incidentally affect[s] the lending operations of Federal savings associations or [is] otherwise consistent with" the purpose of the regulations. 12 C.F.R. § 560.2(c). That intention was confirmed in 61 Fed.Reg. at 50966: "OTS wants to make clear that it does not intend to

---

8. Under the guidelines for preemption analysis set forth by the OTS in 1998, a court's "first step will be to determine whether the type of law in question is listed in paragraph (b) [of 12 C.F. R. 560.2]." If so, the analysis will end there; the law is preempted." (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996)). On the other hand:

"If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption."

*Id.* at 50996–50997. Looking to 12 C.F.R. 560.2(b)(4) and (b)(9), it is manifestly obvious, as the trial court concluded, and all the parties agree, that Subtitle 9 has been preempted.

preempt basic state laws such as state uniform commercial codes and state laws governing real property, contracts [or] torts...." *See also Derenco, Inc. v. Benjamin Franklin Federal Savings & Loan Ass'n,* 281 Or. 533, 577 P.2d 477, 481–88 , *cert. denied,* 439 U.S. 1051, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) (applying state common-law restitutionary principles to loan-related activities of federal lenders); *Fenning v. Glenfed, Inc.,* 40 Cal.App.4th 1285, 1295–99 (1995), *review denied,* 1996 Cal. LEXIS 1870 (1996) (suit against a federal thrift for fraud and unfair business practices not preempted by HOLA nor its implementing regulations); *People ex rel Sepulveda v. Highland Federal Savings & Loan,* 14 Cal.App.4th 1692, 1708, 19 Cal.Rptr.2d 555, *cert. denied, sub nom.*

*Highland Fed. Sav. & Loan Ass'n v. California,* 510 U.S. 928, 114 S.Ct. 338, 126 L.Ed.2d 282 510 U.S. 928, (1993) ("we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc."); *Siegel v. American Savings & Loan Ass'n,* 210 Cal.App.3d 953, 258 Cal.Rptr. 746, 748–53 (1989) (suit based on a variety of state-law claims, including unfair competition, breach of contract, and breach of agency duty, permitted against federal lender); *Konynenbelt v. Flagstar Bank,* 242 Mich.App. 21, 617 N.W.2d 706, 712–14 (2000) (HOLA does not preempt common-law tort and contract claims); *Flanagan v. Germania, F.A.,* 872 F.2d 231, 234 (8th Cir.1989) (claim for tortious interference with contract not preempted by HOLA); *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635, 648 (D.N.J.1990) (private right of action under state consumer protection law not preempted by HOLA);. *Morse v. Mutual Federal Savings & Loan of Whitman,* 536 F.Supp. 1271, 1280–81 (D.Mass.1982) ("[t]he fact that federal statutes or regulations covering some aspects of a regulated area are, by necessity, complex and detailed, does not imply that Congress intended to occupy the entire field to the exclusion of state law").

Nor is a federal lenders' contractual undertakings preempted. The OTS regulations indicate that OTS "occupies the entire field of lending regulations for federal savings associations." In that regard, they provide that, consistent with OTS's intent "to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation," a federal savings association may extend credit as authorized under federal law ... without regard to state laws purporting to regulate or otherwise affect their credit activities." Thus, the regulations apply only to State law, which they define as including "any state statutory regulation, ruling order or judicial decision." § 560.2(a). *See* 61 Fed.Reg. 50591 at 10 ("the terms of the ... loan should be a matter of contract between the savings association and the purchaser"). *Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715, is instructive on this point.

In *Wolens,* the United States Supreme Court addressed the preemptive effect of the Airline Deregulation Act of 1978(ADA), 49 U.S.C.App. § 1305,[9] on state-imposed regulation of the airline industry. There, the plaintiffs, participants in American Airlines' frequent flyer program, AAdvantage, sued the Airline, challenging the retroactive application to them of modifications the Airline made to the program in 1988. 513 U.S. at 224–25, 115 S.Ct. at 822, 130 L.Ed.2d at 723 (describing American Airline's AAdvantage modifications which included the imposition of capacity controls and black-

---

**9.** At issue in that case was the scope of § 1305(a)(1) of the Airline Deregulation Act, "specifically, its application to a state-court suit, brought by participants in an airline's frequent flyer program, challenging the airline's retroactive changes in terms and conditions of the program." *American Airlines v. Wolens,* 513 U.S. 219, 221–22, 115 S.Ct. 817, 820, 130 L.Ed.2d 715, 721 (1995). That section, a preemption provision, provides: "No State ... shall enact or enforce a law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes, or service of any carrier." Id. at 222, 115 S.Ct. at 821, 130 L.Ed.2d at 722. Similar to the intent of the HOLA and 12 C.F.R. § 560.2(a) (2002), to avoid "undue regulatory duplication and [state imposed regulatory] burden," a key component of Congress' mission in deregulating domestic air transport was "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Id.*

out dates). Acknowledging and conceding the right of the Airline to change the terms and conditions of the program, the plaintiffs there complained that the application of the program modifications retroactively devalued the credits they had already earned and, thus, violated the Illinois Consumer Fraud and Deceptive Business Practices Act and was a breach of the Airline's contract with them. *Id.* at 225, 115 S.Ct. at 822, 130 L.Ed.2d at 723. The Supreme Court of Illinois denied the plaintiffs the injunction they sought, holding that to issue one would be a regulation of the Airline's current rendering of service, but, opining that "only those State laws and regulations that specifically relate to and have more than a tangential connection with an airline's rates, routes or services" are preempted, allowed their breach of contract and consumer actions to proceed. *Id* at 225, 115 S.Ct. at 822, 130 L.Ed.2d at 724. Having reconsidered that decision in light of the intervening decision in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992),[10] as instructed by the United States Supreme Court, the Illinois court reconfirmed its earlier decision validating the consumer and contract actions.

The Supreme Court addressed the actions separately. It held that the consumer action was preempted. *Wolens*, 513 U.S. at 228, 115 S.Ct. at 824, 130 L.Ed.2d at 725. Using the National Association of Attorneys General's guidelines, invalidated in *Morales*, as a standard, the Court observed:

> "the Illinois Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the

---

**10.** Section 1305(a)(1) of the ADA was also at issue in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The Court, in that case, construed the phrase, "related to [airline] rates, routes, or services," to mean "having a connection with, or reference to, airline 'rates, routes, or services[.]'" *id.* at 384, 112 S.Ct. at 2037, 119 L.Ed.2d at 167. Consequently, the Court held that Travel Industry Enforcement Guidelines, composed by the National Association of Attorneys General (NAAG), purporting to govern, *inter alia*, the content and format of airline fare advertising was preempted by the ADA. *Id.* at 379, 112 S.Ct. at 2034–2035, 119 L.Ed.2d at 164–165.

Act does not simply give effect to bargains offered by the airlines and accepted by airline customers. In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services, n4 we conclude that § 1305(a)(1) preempts plaintiffs' claims under the Illinois Consumer Fraud Act."

*Wolens,* 513 at 228, 115 S.Ct. at 823–824, 130 L.Ed.2d at 725. It agreed with the Airline, "Congress could hardly have intended to allow the States to hobble [competition for airline passengers] through the application of restrictive state laws." *Id.* at 228, 115 S.Ct. at 824, 130 L.Ed.2d at 735–726.

The Court reached the opposite result with respect to the contract action. It reasoned:

"We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations "and thus do not amount to a State's 'enactment or enforcement [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§ ] 1305(a)(1)." ... Cf. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 526, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion) ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement ... *imposed under State law* ' within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b).")." A remedy confined to a contract's terms simply holds parties to their agreements—in this instance, to business judgments an airline made public about its rates and services."

Id. at 228–29, 115 S.Ct. at 824, 130 L.Ed.2d at 725–726. (Footnotes omitted). The Court rejected any suggestion that the preemption provision applied to private contracts. Noting

the use of the word, "enforce," and suggesting that preemption might be extended to "even state-court enforcement of private contracts," it concluded that "the word series 'law, rule, regulation, standard, or other provision . . . connotes official government-imposed policies, not the terms of a private contract," and that "the ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read, in light of the ADA' overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.' " *Id.* at 229 n. 5, 115 S.Ct. at 824 n. 5, 130 L.Ed.2d at 726. The Court was not persuaded by the Airline's argument that the word, "law" should be read as including "laws that govern the obligations imposed by contract." *Id.* n. 6.

Rejecting the Airline's argument that the Department of Transportation is the only competent monitor of its undertakings, the Court reiterated the point that preemption applied to official government-imposed policies, pointing out that

"The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement."

*Id.* at 232–33, 115 S.Ct. at 826, 130 L.Ed.2d at 728 (footnote omitted). Finally, the Court considered the argument that the Court's preemption position did not save the plaintiffs' claims because those claims "inescapably depend on state policies that are independent of the parties' intent," *Id.* at 233–34, 115 S.Ct. at 826, 130 L.Ed.2d at 728–729, and that to reach the merits of the claims, the state court must first invalidate or limit the airline's express reservation to change the program

rules contained in the program contracts. Significantly, it responded:

"American's argument is unpersuasive, for it assumes the answer to the very contract construction issue on which plaintiffs' claims turn: Did American, by contract, reserve the right to change the value of already accumulated mileage credits, or only to change the rules governing credits earned from and after the date of the change? See Brief for Respondents 5 (plaintiffs recognize that American 'reserved the right to restrict, suspend, or otherwise alter aspects of the Program prospectively,' but maintain that American 'never reserved the right to retroactively diminish the value of the credits previously earned by members'). That question of contract interpretation has not yet had a full airing, and we intimate no view on its resolution."

*Id.* at 234, 115 S.Ct. at 826, 130 L.Ed.2d at 729.

For cases holding that undertakings voluntarily assumed and reflected in private contracts and agreements, *see Volt Info. Scis. v. Bd. of Trs.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 1255–56, 103 L.Ed.2d 488, 500 (1989); *Ass'n of Int'l Auto Mfrs. v. Comm'r, Mass. Dep't of Envtl. Prot.,* 208 F.3d 1, 7–8 (1st Cir.2000); *ProCd, Inc. v. Zeidenberg,* 86 F.3d 1447, 1454–1455 (7th Cir.1996); *Cent. States Health & Welfare Fund v. Pathology Labs.,* 71 F.3d 1251, 1254–1255 (7th Cir.1995); *Martin v. Ford Motor Co.,* 914 F.Supp. 1449, 1454 (S.D.Tex. 1996); *Kawamata Farms, Inc. v. United Agric. Prods.,* 86 Hawai'i 214, 948 P.2d 1055, 1080 (Haw.1997); *Wallace v. Parks Corp.,* 212 A.D.2d 132, 629 N.Y.S.2d 570, 574 (1995).

Noting that the court stated that "the parties could not elect to have state law govern over federal law," *Chaires,* 131 Md.App. at 79, 748 A.2d 34 (Footnote Omitted), which they interpret as a resolution of the question whether a contractual choice-of-law provision is preempted by federal regulations intended to occupy the field at issue, the appellees maintain, as we have seen, that *Chaires* is dispositive of the issue presented in this case. They assert further that it is consistent with all of the federal authorities on that point, citing

*Fidelity Federal Savings and Loan Assoc., et. al. v. de la Cuesta, et al.,* 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674–675; *Brown v. Investors Mortgage Co.,* 121 F.3d 472, 476 (9th Cir.1997); *Atkinson v. Gen. Elec. Credit Corp.,* 866 F.2d 396, 398 (11th Cir.), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989); *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.,* 661 F.2d 479, 483 (5th Cir.1981); *Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287, 293–94 (3rd Cir.), *cert. denied,* 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001); *Jones v. U.S. Fid. & Guar. Co.,* No. 90–5005, 1992 WL 202327, at 4, 1992 U.S. Dist. Lexis 12303, at *10 (E.D.La. 1992).

■ The appellees argue that *Wolens* does not mandate the result that the appellants urge and, in fact, is really inapposite. Characterizing the *Wolens* holding, consistent with *Smith v. Comair, Inc.,* 134 F.3d 254, 258 (4th Cir.1998) ("Wolens recognized that state contract claims escape preemption only when courts would be confined to the terms of the parties' agreement."); *Breitling U.S.A., Inc. v. Fed. Express Corp.,* 45 F.Supp.2d 179, 184 (D.Conn.1999) ("In considering whether a breach of contract action survives [ ] preemption, a reviewing court is restricted to the actual terms of a party's bargain."),[11]

---

**11.** *See also Stone v. Continental Airlines, Inc.,* 905 F.Supp. 823, 826 (D.Haw.1995); *Lyn–Lea Travel Corp. v. American Airlines,* 283 F.3d 282, 286–90 (5th Cir.2002) (holding plaintiff's affirmative state law claims, tortious interference with business relationships, breach of contract, fraud, and violations of the Texas Deceptive Trade Practices Act, preempted by the ADA, but holding its affirmative defense of fraudulent inducement not preempted). Explaining the preemption decision, the court said:

"Lyn–Lea's claims for affirmative relief have a significant relationship to the economic aspects of the airline industry. Lyn–Lea asserts that (1) American intentionally interfered with its business relationships with four customers and an employee, luring the customers away with discounted fares; and (2) American acted fraudulently and deceptively while negotiating the Sabre CRS agreement with Lyn–Lea. The first claim involves American's dealings with customers, while the second relates to enforceability of the Lyn–Lea contract. In other words, by its first claim, Lyn–Lea is seeking the application of Texas common law in a way that would regulate American's pricing

cases applying it, as being "that claims based on state law or policies external to a contract, as opposed to the express terms of the contract, are preempted by governing federal law," they emphasize that the appellants' claims are premised wholly on the terms of Subtitle 9, "all of which are external to the Cardholder Agreement itself." The appellees conclude, therefore, that the claims are preempted, even under *Wolens*.

*Chaires* is not dispositive of the case *sub judice*. To be sure, the choice of law provision at the center of the Court of Special Appeals's analysis, although conceded by the parties to be ambiguous, is quite similar to the provision under review in this case:

> "This loan transaction is governed by Title 12, Subtitle 10 of the Commercial Law Article of the Annotated Code of Maryland."

In addition, the FNMA/FHLMC uniform instruments (deeds of trust) in that case indicated that "[l]oans are originated under Title 12, subtitle 10 of the Commercial Law Article of the Maryland Code." Relying on this language from the loan documents and certain letters written to the Maryland Commission by Chevy Chase, *Chaires*, 131 Md.App. at 79, 748 A.2d at 42, the appellants in that case argued that the appellees in that case " 'elected' Maryland law and waived federal protection." *Id.* Also, they challenged the trial court's construction of the choice of law provision, asserting that, being ambiguous, it "should be interpreted by the intent of the parties." *Id.* The intermediate appellate court rejected these arguments. Relying on the provisions of 12 C.F.R. § 560.2 providing that the regulations occupied the entire field of lending and "are to be the governing law for certain activities, including the charging of fees, by federal institutions," *Chaires*, 131 Md. App. at 79, 748 A.2d 34, that court held: "[c]ontrary to appellants' argument that appellees elected Maryland law over federal law, the parties could not elect to have state law govern over federal law." Id. It then concluded, "upon careful

---

policies, commission structure and reservation practices." Id. at 287.

examination," *id.* at 83, 748 A.2d at 44–45, of the documents on which the appellants relied to support their argument that the appellees "elected Maryland law over federal law," *id.,*

> "The cited deed language, as well as the September 6, 1990 letter, simply indicate that appellees were electing to have the Maryland law govern the non-regulated portions of the contract. Although appellees could have utilized a more general choice of law language in the documents and letters, appellees did not, as they could not, elect state law over federal law for all aspects of the loan contract."

*Id.* at 85, 748 A.2d. at 45–46.

Whether the appellants' claims are preempted and whether the appellees contracted to comply with Subtitle 9 are separate and different questions, requiring different analyses. The former is a defense requiring an analysis of federal law and the determination of the impact the relationship of the parties has on the ability of that law to fulfill its intended goal. The latter involves contract interpretation, discerning the parties' intent, either actual or presumed. Contract interpretation, unlike the question of federal preemption, is a matter of state law. *Volt Info. Scis. v. Bd. of Trs.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488, 497 (1989) ("the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review").[12] The appellants point out, accurately:

---

12. Maryland has long adhered to the objective law of contract interpretation and construction. *Taylor v. NationsBank,* 365 Md. 166, 178, 776 A.2d 645, 653 (2001); *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250–51, 768 A.2d 620, 629–31 (2001); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298, 304 (1996). We explained this principle in *Taylor, supra,* as follows:

> "A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

"Federal preemption is a defense that argues that even if plaintiffs' state law contract claims are correct—i.e. even if Chevy Chase had promised to follow "subtitle 9 of the Maryland Commercial Code" with respect to the notice it would give cardholders of amendments, and even if it broke that promise—federal law bars those claims. The contract interpretation issue, by contrast, raises the question of whether or not the language of the contract specifying Subtitle 9 requires Chevy Chase to comply with the credit card amendment provisions of Subtitle 9."

■ Although purporting to decide the issue on preemption grounds, at bottom, *Chaires* was decided on contract interpretation principles. To be sure, the Court of Special Appeals is correct, where there is a conflict between federal and state law or where federal regulations preempt a field, state law may not be elected over federal law in that field. Here, however, the court acknowledged that 12 C.F.R. § 560.2(c) excludes some state laws from preemption and that it was reasonable for the parties in that case to include a choice of law provision. *Chaires,* 131 Md.App. at 83, 748 A.2d at 44–45. But rather than addressing the preemption issue directly, the court ana-

---

Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean."
365 Md. at 178–179, 776 A.2d at 653 (citing *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985). Moreover, "whether a contract is ambiguous is ordinarily determined by the court as a question of law." *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358, 362, citing *State Highway Admin. v. Bramble,* 351 Md. 226, 239, 717 A.2d 943, 949 (1998). *See also JBG/Twinbrook Metro Ltd. v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898, 911 (1997) ("The interpretation of a written contract is ordinarily a question of law for the court."); *Suburban Hospital v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069, 1075 (1991), quoting *Gordy v. Ocean Park, Inc.,* 218 Md. 52, 60, 145 A.2d 273, 277 (1958)(" 'As a general rule, the construction or interpretation of all written instruments is [initially] a question of law for the court....' "); *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308, 310 (1967)("If a written contract is susceptible of a clear, unambiguous and definite understanding, ... its construction is for the court to determine."). Because the determination of ambiguity is a question of law, not fact, the determination is subject to a de novo review by appellate courts. *Calomiris, supra,* 353 Md. at 434, 727 A.2d at 362.

lyzed the parties' agreement, including extraneous documents, and decided what the appellees in that case intended:[13] "it appears that the appellees were not attempting to opt for Maryland law over federal law, but were attempting to include a choice of law provision to govern the areas not preempted by the federal regulations."

Moreover, by emphasizing that the parties could not "elect to have state law govern *over* federal law," the court suggests that there was a conflict between federal and state law. Where that occurs, preemption in favor of the federal law necessarily follows. *See de la Cuesta,* 458 U.S. at 152, 102 S.Ct. at 3022, 73 L.Ed.2d at 675. In this case, as the appellants point out, "[t]here is no conflicting federal law for Chevy Chase to have selected Subtitle 9 'over.' " *See Williams v. First Gov't Mort. and Investors Corp.,* 176 F.3d 497, 500 (1999), in which the D.C. Circuit held that the federal Truth in Lending Act did not preempt the District of Columbia Consumer Protection Procedures Act, noting that

> "Nothing in TILA or its legislative history suggests that Congress intended the Act's disclosure regime to provide the maximum protection to which borrowers are entitled nationwide; states remain free to impose greater protections for borrowers. First Government has identified no way in which the CPPA would defeat TILA's purposes, nor has it suggested how joint applicability of the two statutes would subject it to conflicting obligations."

Id. at 500. The appellees' response, that

> "TILA and its implementing regulations establish a uniform federal scheme for disclosure of credit terms, applicable to all creditors including federal savings associations, and OTS has expressly precluded any state regulation of such disclosures insofar as federal savings associations like Chevy Chase are concerned,"

---

13. We do not address whether the Court of Specials Appeals applied the law appropriately.

is not persuasive. It relies only on 12 C.F.R. § 560.2(a) and fails to take account of the exemption in § (c).

The other cases the appellees cite are no more persuasive. In *de la Cuesta*, unlike in this case, there was direct conflict between federal regulations permitting due-on-sale clauses in mortgage agreements and restrictions placed by the California Supreme Court on the exercise of the clauses, which was resolved in favor of preemption. 458 U.S. at 154–56, 102 S.Ct. at 3023–3024, 73 L.Ed.2d at 675–677. In *Brown v. Investors Mortgage Co., supra,* 121 F.3d 472, and *Atkinson v. Gen. Elec. Credit Corp., supra,* 866 F.2d 396, the court rejected the argument that a general choice of laws provision was effective to avoid the preemptive effect of Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) when the agreement otherwise indicated the contrary intent. In *Brown,* the court commented:

> "This language does not address federal law or the relation between state and federal law. The fact that the parties chose to apply the laws of Washington, rather than the laws of another state, does not mean the parties decided that federal law should not apply."

121 F.3d at 476. In *Atkinson,* to the court, it was "readily apparent that the parties intended that DIDMCA apply." 866 F.2d at 398.

*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., supra,* 661 F.2d 479, 483 does not directly involve the question of preemption. Thus, the statement to which the appellees refer, that "[a] choice of law provision, therefore, merely designates the state whose law is to be applied to the extent its use is not preempted by nor contrary to the policies of the," 661 F.2d at 483, applicable federal law, has little relevance to this discussion. It is significant that, in that case, the court engaged in extensive contract interpretation. *Id.* at 483–84. Neither is *Roadway Package Sys., Inc. v. Kayser, supra,* 257 F.3d 287, 293–94 apposite. There, the court held that contracting parties may opt out of the FAA's default vacatur standards and fashion their own. 257 F.3d at 288. It was in this context

that the court stated that the generic choice-of-law clause, indicating that the agreement in that case "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania," "sheds little, if any, light on the parties' intent," and thus rejected Kayser's argument that it should be "read as expressing a desire to opt out of the FAA's default regime and to incorporate arbitration rules borrowed from Pennsylvania law." *Id.* It is significant that the court characterized the issue. as simply a matter of contract construction, *id.*, "not one of choice-of-law or preemption." *Id.* at 294. It is also significant that the court acknowledged that a different result would have been appropriate had the parties agreed that "any controversy shall be settled by arbitration in accordance with the terms of the Pennsylvania Uniform Arbitration Act." Id. at 297.

Finally *Jones v. U.S. Fid. & Guar. Co., supra,* No. 90–5005, 1992 WL 202327, 1992 U.S. Dist. Lexis 12303 is inapposite. It involved the Employment Retirement Income Security Act, 29 U.S.C. § 1144(a) (ERISA), a "deliberately expansive" statute designed to make regulation of employee benefit plans an exclusively federal concern. *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 979 (5th Cir.1991), citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Thus, the statute expressly preempts state law where it relates to any ERISA Plan.[14] *See Degan v. Ford Motor Co.,* 869 F.2d 889, 893 (5th Cir.1989) (all "common law contract and tort claims based upon laws of general application, that is, not specifically related to insurance or employee severance or discrimination are preempted by ERISA.").

Despite its protestations to the contrary,[15] implicit in the appellees' *Wolens* argument is the notion that, in contracts

---

14. 29 U.S.C. § 1144(a) provides:
   "Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]"

15. The appellees state that they "never contended that the narrow exception in 12 C.F.R. § 560.2(c) is limited to contractual provisions

where preemption is an issue, even though federal law may exempt contracts from preemption, all of the terms of the parties' contract must be set forth in the contract, none of the principal provisions may be supplied by reference. They read the passage from *Wolens,* prohibiting "enlargement or enhancement [of the parties' bargain] based on state laws or policies external to the agreement" to mean that, as the appellants put it, "federal law does not preempt a private party from undertaking obligations spelled out in a contract, but does preempt a party from undertaking contractual obligations by reference in a contract to some body of rules 'external' to the contract." Not only does such a distinction make absolutely no sense, it fails to distinguish between the preemption issue and the contract interpretation issue. The latter is, as we have seen, a question of state law. Maryland law recognizes that parties may agree to define their rights and obligations by reference to documents or rules external to the contract. *Kirby & McGuire, Inc. v. Board of Education,* 210 Md. 383, 385, 123 A.2d 606, 608 (1956) ("It is clear, too, that by virtue of the incorporation by reference of the contract into the bond and of the other documents into the contract, the bond and all of the documents are to be read and construed together, as if set forth in the bond."); *Ray v. William G. Eurice & Bros., Inc.,* 201 Md. 115, 128, 93 A.2d 272, 279 (1952) ("The lower court seemingly attached significance to the fact that the plans and specifications were not physically fastened to the contract document which was executed, although it specifically and explicitly referred to both. In this situation physical attachment has not the significance so attributed to it. It is settled that where a writing refers to another document that other document, or so much of it as is referred to, is to be interpreted as part of the writing."). *See*

---

that mimic[] state law, rather than incorporating state law by reference. On the other hand, the appellees characterize the Wolens Court as "distinguish[ing] ... between claims that are based on the express terms of the contract, which are not preempted and claims that involve "enlargement or enhancement based on state laws or policies external to the agreement," which are preempted.

*Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 346 Md. 122, 128, 695 A.2d 153 (1997).

The *Wolens* Court drew no such distinction. And the courts applying *Wolens* do not draw such a distinction either. The distinction that the Court drew was between what is required, as a matter of law, without any necessity for a specific agreement to that effect, and what a party voluntarily agrees to do, without regard to what the law might require in the absence of that agreement. It is the law or policy that applies to any agreement made by parties that is external to, not a part of, the parties' bargain, not the fact that terms of the agreement are supplied by reference. The cases applying *Wolens,* including those on which the appellees rely, prove the point.

In *Breitling U.S.A., Inc. v. Fed. Express Corp., supra.,* 45 F.Supp.2d 179, Breitling sought to recover damages under an agreement providing that FedEx was liable only for its own negligence, by interposing the doctrine of waiver. The court held, "because Breitling seeks to impose common law principles and policies on the agreement between the two parties, Breitling's claims are preempted by the ADA." *Id.* at 183–84. The common law principle was not included in the contract, but would ordinarily have been applicable to the contract as a matter of law. Similarly, in *Smith v. Comair, Inc., supra,* 134 F.3d 254, a passenger's breach of contract action against Comair and Delta Airlines for refusal to allow him to board his flight was held to be preempted. The court was persuaded by the effect of Comair's federal defenses on the preemption question, noting "[b]ecause Comair invokes defenses provided by federal law, Smith's contract claim can only be adjudicated by reference to law and policies external to the parties' bargain and, therefore, is preempted under the ADA." *Id.* at 258. It also pointed to the fact that the action implicated the airline's discretion and/or duty under federal law, *id.,* and the practical effect on federal law: "If passengers could challenge airlines' boarding procedures under general contract claims alleging failure to transport, we would allow the fifty states to regulate an area of unique federal concern—airlines' boarding

practices." *Id.* at 258–59, citing *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 339 (5th Cir.1995) (en banc).

To like effect, *see, Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423 (7th Cir.1996), in which the court, applying *Wolens,* permitted a contract action to proceed, *id.* at 1432, but also held the claim for punitive damages to be preempted, opining, "Rather than merely holding parties to the terms of a bargain, punitive damages represent an 'enlargement or enhancement [of the bargain] based on state laws or policies external to the agreement." ' *Id.* at 1432 n. 8. *Deerskin Trading Post, Inc. v. United Parcel Service of America,* 972 F.Supp. 665, 672–73 (N.D.Ga.1997) (breach of contract claim not preempted but prayer for punitive damages and injunctive relief is, because such relief goes beyond the parties' agreement); *Richmond Capital Corp. v. Federal Express Corp.,* 29 F.Supp.2d. 737, 740 (M.D.La.1998); *Manning v. Skywest Airlines,* 946 F.Supp. 767, 769 (C.D.Cal. 1996) (although involving a tort action, the analysis is supportive of non-preemption and indeed non preemption was held).

Nor are the appellees correct "that the requirements of Subtitle 9 can be imposed on Chevy Chase." It is true that Subtitle 9 is a state law, as defined by 12 C.F.R. § 560.2(a) and, thus, falls within the category of state imposed obligations that regulation preempts. It is not true that Subtitle 9 is required by a state statutory regulation, ruling, order or judicial decision to be complied with in this case. It is in this case only because the agreement between the parties refer to it and do so in the context of the notice to be given in the event that the agreement is amended. Indeed, that agreement was prepared by Chevy Chase; it was not imposed on Chevy Chase as a matter of law.

To be sure, the disputed contract provision has been included, as we have seen, in the section of the Cardholder Agreement dealing with "Governing Law," rather than the section covering amendments. In addition, it refers both to Subtitle 9 and "applicable federal law. Contract interpretation will determine what the agreement means, the intent of the parties

in entering into this agreement, Chevy Chase's intent in drafting it and, in particular, the scope and extent of the parties' obligations and rights under it. This will require application of the familiar canons of construction, to which we earlier referred. *Supra* at n. 12.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.

RAKER, Judge, dissenting.

I respectfully dissent. I would affirm the judgment of the Circuit Court for Baltimore City on the grounds set forth by the trial judge, namely, that all of the plaintiff's claims are preempted by federal law.

On the question of whether this action is exempt from federal preemption, the Circuit Court stated the following:

"This court is convinced that to permit [appellants] to thwart the admitted preemption of the relevant law solely because of a general reference to Maryland law, flies in the face of common sense and contract interpretation. When the parties mentioned Subtitle 9 of the Maryland Code and 'applicable federal law' as governing law, they did not incorporate the protections of a Maryland regulatory scheme into the agreement. Had they meant to do that, they could have done so in clear-cut terms. As the *Chaires* case makes clear, they could not waive federal preemption and could only have intended that state law apply as 'governing law' should 'federal law' not apply. There is no basis for claiming that they entered into a private agreement incorporating a complex and detailed state regulatory scheme."

The Circuit Court got it right. *See Chaires v. Chevy Chase Bank,* 131 Md.App. 64, 748 A.2d 34 (2000); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).